Peter G. CRANFORD and Helen Cranford
v.
The UNITED STATES.
No. 290-60.

United States Court of Claims.
Nov. 13, 1964.

Charles H. Burton, Washington, D. C., for plaintiffs. Robert Ash and Ash, Bauersfeld & Burton, Washington, D. C., were on the brief.

Sheldon P. Migdal, Washington, D. C., with whom was Louis F. Oberdorfer, Asst. Atty. Gen., for defendant. Edward S. Smith, Lyle M. Turner, and Philip R. Miller, Washington, D. C., were on the brief.

Before LARAMORE, Acting Chief Judge, DURFEE, DAVIS, and COLLINS, Judges, and JONES, Senior Judge.

JONES, Senior Judge.

Plaintiffs[1] seek to recover alleged overpayment of Federal income tax for the year 1955. The single question for our determination involves the right of plaintiff to long term capital gain treatment for a sum of $7,500.

Sometime between 1938 and 1939, plaintiff conceived and invented a format or structure for a radio program. This format was based upon a mathematical formula under which a sponsor would be able to give away an unlimited amount of money, on a progressive basis, to contestants in a quiz show. Briefly, the formula allowed a contestant to parlay and progressively double the money he had previously won by giving correct answers to successive questions. Two friends who were employed by a radio station had pointed out to plaintiff that a "Dr. I.Q." radio program was deficient in that it was not capable of giving away enough money to contestants. Plaintiff's formula was designed to overcome this defect.

In May and June of 1939, plaintiff had applied to the Copyright Office of the Library of Congress in Washington, D. C., for copyright protection of his radio and theater quiz program. The Copyright Office replied that it was not possible to copyright either the name of a radio program or the essential feature of the proposed program.

In July of 1939, plaintiff disclosed his format to the sales manager of a radio station in Atlanta, Georgia, who then wrote to Young and Rubican, Inc., of New York City, in an effort to sell plaintiff's idea. No sale was made as a result of this effort. Hearing that The Biow Company was searching for a radio program, plaintiff wrote that company on January 27, 1940, and submitted his prospectus for a radio program "Double or Nothing" for consideration. The prospectus contained the notation "Copyright—September 12, 1939. Peter G. Cranford", but plaintiff stated in the accompanying letter that he had been informed that he would not be able to obtain a copyright on the structure of the program. As a result, The Biow Company sent plaintiff a contract covering his format for the radio program. Plaintiff signed this contract on February 8, 1940, which provided that in consideration of a payment of $75 by The Biow Company, plaintiff assigned and conveyed to The Biow Company all of his title and interest in "Double or Nothing" and in the radio program conceived and invented by him. The Biow Company stated in the contract, however, that in the event of commercial success, the com-

---

1. Although this suit is brought jointly by husband and wife, we shall use the term "plaintiff" to refer to Peter G. Cran-ford since the controversy pertains to his activities.

pany would recognize a moral obligation to pay plaintiff such further consideration as The Biow Company shall determine in its sole and uncontrolled discretion. Thereafter, the name of the program was changed to "Take It or Leave It" and it was successfully put on the air over a number of Columbia Broadcasting System stations. Under the moral obligation clause of the contract, The Biow Company and plaintiff arranged for certain additional weekly payments to plaintiff during the life of the radio program.

Subsequently, plaintiff read in a magazine that The Biow Company was negotiating with Columbia Motion Pictures for the sale of the motion picture rights to the program. Plaintiff then wrote The Biow Company, taking the position that the only rights he had sold were the rights in the radio program. After further negotiations, a contract was entered into by the parties on June 25, 1942, which confirmed and ratified that the initial contract of February 8, 1940, transferred all rights of every kind, including radio, television and motion picture rights. This second contract provided, however, that The Biow Company would pay to plaintiff one-third of the payments received by The Biow Company in connection with the licensing of the use of the program. The present controversy concerns payments made to plaintiff pursuant to this second contract.

On January 1, 1944, The Biow Company assigned all of its rights in connection with the name "Take It or Leave It" and related matters to Take It or Leave It, Inc. This assignment was made subject to plaintiff's right to receive one-third of the payments derived from licensing activity. Take It or Leave It, Inc. then entered into a license agreement with Louis G. Cowan, Inc. on March 4, 1955, under which the licensee Louis G. Cowan, Inc. was given the sole and exclusive right to produce a television program based upon the idea and title "Take It or Leave It." Under this license agreement, Take It or Leave It, Inc. was to receive 50 percent of the net profits made by the licensee, Louis G. Cowan, Inc. Pursuant to the license agreement, Louis G. Cowan, Inc. produced a television program entitled "The $64,000 Question." During 1955, Louis G. Cowan, Inc. paid to Take It or Leave It, Inc. $22,500. Of this amount, plaintiff received his one-third share, or the sum of $7,500.

Plaintiff's amended Federal income tax return for the year 1955, filed jointly with his wife on July 23, 1956, included the $7,500 as income and plaintiff paid the tax due thereon. On August 23, 1957, plaintiff filed a claim for refund based on the contention that the $7,500 received by him during 1955 was a gain from the sale of a capital asset and income tax should have been paid on that basis. Plaintiff's claim for refund was disallowed on August 9, 1960.

It is the plaintiff's contention that the format for a radio or television program, which he invented, is a property distinct from the radio program itself. Plaintiff further contends that since this property is not copyrightable, it is not within the exclusionary provision of § 1221(3) of the Internal Revenue Code of 1954 and, therefore, it qualifies as a capital asset under the general rule of § 1221. Therefore, plaintiff concludes he is entitled to capital gain treatment for the $7,500 received in 1955.

The Government contends that the amount in question should be treated as ordinary income for several reasons. First, the Government says that the term "property" in § 1221 of the 1954 Code should not be construed to include an abstract idea. Secondly, the Government contends that plaintiff's idea for a radio show is outside of the statutory definition of a capital asset because it is excluded by § 1221(3) under the term "similar property." Finally, the Government urges that plaintiff is not entitled to long term capital gain treatment because he has not proved a six-month holding period.

The pertinent parts of § 1221 of the 1954 Code are:

"For purposes of this subtitle, the term 'capital asset' means *property* held by the taxpayer (whether or not connected with his trade or business), but does not include—

\* \* \* \* \* \*

"(3) a copyright, a literary, musical or artistic composition, or *similar property*, \* \*."

[Emphasis supplied.]

It is the Government's contention that plaintiff's format or idea is not "property" or that if it is "property" then it is "similar property" within the meaning of § 1221. The Government has cited two cases wherein the courts have expressed considerable doubt as to whether an abstract idea could be considered to be "property" for capital gain purposes.[2] Stern v. United States, 164 F.Supp. 847, 852 (E.D.La.1958), aff'd per curiam, 262 F.2d 957 (5th Cir. 1958), cert. denied, 359 U.S. 969, 79 S.Ct. 880, 3 L.Ed.2d 836 (1959); Harold L. Regenstein, 35 T.C. 183, 190 (1960). In Regenstein, the taxpayer therein had received $10,000 from the Metropolitan Life Insurance Company for his idea or plan for selling group life insurance to Federal Government employees. Although the Tax Court voiced its doubts as to whether the plan or idea could be considered to be property, that issue was specifically left undecided because the court found that the payment was for services rendered by Regenstein to the life insurance companies. In the Stern case the taxpayer wrote the novels about "Francis" the talking mule. The taxpayer, Stern, sold his interest in the character "Francis" to the Universal Pictures Co., Inc. Thereafter, Stern claimed the payments he received from that sale as capital gain. The District Court in that case held that the character "Francis" was a "literary composition" because without the literary description of Francis, the character would cease to exist. It is true that the District Court's opinion in Stern contained language which suggested that "intellectual conception," sans form and substance, is incapable of ownership and therefore, of being "property held by the taxpayer." However, the court there was speaking of a literary character described in copyrighted novels.

■ We find it unnecessary to decide the question of whether plaintiff's format is or is not "property" because we are of the opinion that plaintiff's idea is within the definition of the term "similar property" in § 1221(3) of the 1954 Code.

■ Section 1221(3) of the 1954 Code was first introduced into the tax law by section 210(a) of the Revenue Act of 1950, 64 Stat. 906, 933. The legislative history of this provision shows that the Congress intended to close a loophole with respect to capital gain treatment. Prior to the enactment of section 210(a) of the 1950 Act, the tax treatment of a sale of a copyright or book depended on the professional status of the author. If the author was a writer by profession, then the sale resulted in ordinary income; if he was an amateur, then the sale produced capital gain. See the discussion in Surrey and Warren, Federal Income Taxation 753–754 (1962). The Committee Reports for the Revenue Act of 1950 show that the Congress intended to provide uniform ordinary income treatment for the sale of a product created by personal effort. See Senate Finance Committee Report, S.Rep. No. 2375, 81st Cong., 2d Sess. 43, 83–84 (1950); House Committee on Ways and Means Report, H.Rep. No. 2319, 81st Cong., 2d Sess. 54, 91–92 (1950).

2. During oral argument, the Government cited another case, Bowen v. Yankee Network, 46 F.Supp. 62, 63 (D.C.Mass.1942), for the proposition that a plan for a radio program was merely an idea in which there was no property right. However, the Bowen case was concerned with wrongful appropriation of an idea under common-law property doctrine, and it was not concerned with the tax status of the proceeds from the sale of such an idea.

There is no question that plaintiff's idea or format was the product of his personal effort. To escape the application of § 1221(3) of the 1954 Code, plaintiff contends that his format is neither "a copyright, a literary, musical, or artistic composition" nor a "similar property." Plaintiff says that the term "similar property" as used in § 1221(3) means property *similar to those specifically named* which are all property eligible for copyright protection. To support his contention, plaintiff quotes from the Senate Finance Committee Report, supra, U.S.Code Cong. Service 1950, p. 3140, the following statement:

"The amendment * * * will also exclude from the capital asset category any property similar to that specifically named; for example, a radio program which has been created by the personal efforts of the taxpayer."

Plaintiff also points to Regulations § 1.1221–1(c):

"For purposes of section 1221(3), the phrase "similar property" includes, for example, such property as a theatrical production, a radio program, a newspaper cartoon strip, *or any other property eligible for copyright protection* * * *." [Emphasis added.]

Thus, plaintiff concludes that since his format is not copyrightable and is not one of the specifically named items, the format is not excluded from the definition of a capital asset by § 1221(3).

■ The quoted language in the Regulations need not detain us long. In the first place, the statement was qualified by the words "includes" and "for example." As the Government correctly pointed out, § 7701(b) of the 1954 Code provides:

"The terms 'includes' and 'including' when used in a definition contained in this title shall not be deemed to exclude other things otherwise within the meaning of the term defined."

It is to be presumed that the Regulations, in explaining the statutory language, would also conform itself to the definitions given therein. Furthermore, Regulations contrary to the intent of the Congress, if such is the case here, obviously cannot stand.

■ The statement from the Senate Finance Committee Report, quoted by plaintiff, refers to "property similar to that specifically named." Obviously, this language does not limit the "similar property" to those already enumerated or there would be no reason to add this category at all. We believe that the limitation is disclosed by the adjective "similar." In other words, properties having important characteristics common to those named items are "similar property" within the meaning of the statute. Our task here is to identify those important common characteristics.

■ Plaintiff is aware of the above interpretation, as he is contending that the important common characteristic of the named items is their entitlement to copright protection. We disagree with this contention. It seems to us that the important point common to the specified categories, aside from their artistic nature, is that they are all products of personal effort. Plaintiff has not shown us any reason why copyrightable property should be singled out and be denied capital gain treatment while products of personal effort which are not subject to copyright should enjoy a tax advantage. On the contrary, capital gain treatment is an exception to the normal rule and the definition of a capital asset must be narrowly applied, Corn Products Refining Co. v. Commissioner, 350 U.S. 46, 52, 76 S.Ct. 20, 100 L.Ed. 29 (1955), and the Committee Reports associated with the Revenue Act of 1950 make it clear that the provision here in question was intended to apply against products of personal effort. See Senate Report, supra, pp. 43 and 83, and House Report, supra, pp. 54 and 92. In addition, the "Sum-

mary of H.R. 8920 as Agreed to by the Conferees," [3] states:

"Section 210 provides that when any person sells a copyright, a literary, musical, or artistic composition, or *similar property which is the product of his personal effort*, his income from the sale is taxed as ordinary income." [Emphasis added.]

From the foregoing discussion we conclude that all types of artistic works which are products of personal effort and skill are excluded from the definition of a capital asset, by virtue of the term "similar property," unless specifically excepted. It is beyond dispute that a radio program itself is within the definition of a "similar property." We see no relevant distinction between a radio program and a format for the radio program for the purpose of the definition of a "similar property." Accordingly, we conclude that plaintiff's format is not a capital asset.

In view of our holding that plaintiff's format for a radio program is not a capital asset by virtue of the exclusionary provision of § 1221(3), we need not pass on the Government's final contention that plaintiff has not proved a six-month holding period.

Plaintiffs are not entitled to recover. Their petition is dismissed.

3. 96 Cong.Rec. 15594, 15599 (1950).