Arthur KURLAN and Marilyn Kurlan, Petitioners,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

COMMISSIONER OF INTERNAL REVENUE, Petitioner,

v.

Arthur KURLAN and Marilyn Kurlan, Respondents.

Nos. 186–7, Dockets 29132–33.

United States Court of Appeals Second Circuit.

Argued Dec. 17, 1964.

Decided March 26, 1965.

---

Burton L. Litwin, New York City (Michael Halperin, New York City), for Arthur Kurlan and Marilyn Kurlan.

Jonathan S. Cohen, Washington, D. C. (Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, Harry Baum, Washington, D. C., Attys.), for C.I.R.

Before FRIENDLY, HAYS and MARSHALL, Circuit Judges.

FRIENDLY, Circuit Judge:

Arthur Kurlan, along with his wife who joined in one of his returns, petitions for review of a decision of the Tax Court, T. C. Memo. 1963–282, which sustained a determination of deficiencies in Kurlan's income tax for 1954 and 1955 on the ground that amounts received pursuant to a settlement of litigation against Columbia Broadcasting System (CBS) constituted ordinary income rather than long-term capital gain. The Commissioner has filed a protective cross-petition with respect to Kurlan's taking an attorney's fee related to the litigation as an ordinary deduction in 1954. This is to be considered only if we should conclude, in disagreement with the Tax Court, that the taxpayer correctly reported the income as capital gain. We affirm the Tax Court on Kurlan's petition, and thus do not reach the Commissioner's.

Kurlan was an independent California writer and producer of motion pictures and of radio and television programs. He became interested in presenting a serial radio or television program utilizing the two main characters from Ruth McKenney's well-known book "My Sister Eileen" and other of her copyrighted writings which portrayed adventures of the pretty-but-dumb and plain-but-bright sisters. On March 11, 1946, McKenney entered into an agreement with Kurlan in which she assigned radio and television rights in the characters and stories; the assignment was for a period to begin upon the commencing of production by November 15, 1946, and it was to remain in force so long as production was continued. McKenney was to receive a percentage of what Kurlan obtained. He thereupon produced, for audition purposes, a sample wax recording for a radio program, which incorporated his allegedly new and original treatment and development of McKenney's characters, minor characters apparently of his own devising, and methods of presentation claimed to be unique. In June, 1946, he submitted to CBS, apparently in California, his ideas for a program and the sample record.

CBS did not buy Kurlan's program. But in July, 1946, it publicized a forthcoming weekly program, "My Friend Irma," built around the pretty-but-dumb and plain-but-bright theme, which allegedly incorporated, both in characters and in presentation, original ideas belonging to McKenney and Kurlan. In December, 1946, McKenney and Kurlan extended their original agreement for six months beginning January, 1947. In April, CBS started "My Friend Irma" as

a weekly radio program and later introduced it as a weekly television program.

Kurlan, having received an unrestricted assignment of McKenney's radio and television claims against CBS on terms not disclosed by the record, brought an action for damages against CBS in the California state courts. The complaint relied both on McKenney's literary property and on Kurlan's original contributions, pleaded various theories of tort, contract and quasi-contract, but did not allege infringement of federal copyrights. A demurrer led to a decision by the Supreme Court of California six years later, Kurlan v. Columbia Broadcasting System, 40 Cal.2d 799, 256 P.2d 962 (1953), with one opinion joined by three justices, another concurring in the judgment, a concurring and dissenting opinion by Mr. Justice Traynor on behalf' of himself and another justice who thought the majority's disposition somewhat too favorable to Kurlan, and a dissent which considered it not favorable enough. The gist of the decision was that McKenney's rights to literary property as recognized by § 980 of the California Civil Code had been lost by publication and that Kurlan's contributions by way of literary expression and development of minor characters had not been copied, but that the possibility of some recovery for violation of Kurlan's rights to his allegedly original methods of presentation and format could not be excluded on the pleadings alone. The case was therefore sent back for trial on that issue.

In December, 1953, the California action was settled. CBS agreed to pay a total of $75,000—$22,000 to Kurlan before the year-end, $38,000 to him and his attorney jointly on January 15, 1954, and $15,000 to Kurlan a year later. In return Kurlan and McKenney released all claims, whether for violations of literary property, infringement of copyright, or in contract, from CBS' past or future production of "My Friend Irma," and the pending California action was terminated with prejudice. Of the total of $75,000, McKenney received $7,500 which Kurlan reflected by reducing his 1954 gross receipts from CBS to $30,500 and thus his overall CBS receipts to $67,500. The cost of producing the sample record being some $9,000, Kurlan took this as his basis and reported a long-term capital gain of $58,500, allocated on his returns in proportion to receipts from CBS in each of the years. Kurlan's attorney received $15,000 and Kurlan did not exclude this payment from his capital gain but treated it as a deduction from ordinary income in 1954.

Taking the decision of the Supreme Court of California as defining the only rights of which Kurlan could dispose, despite "the understandably broad and all-encompassing language of the settlement agreement," the Tax Court concluded that his "possible creation of an original and novel radio and television program technique and method of presentation" could not qualify for capital gain treatment in view of § 1221(3)(A) of the Internal Revenue Code of 1954, which says that the term "capital asset" does not include "a copyright, a literary, musical, or artistic composition, or similar property, held by—(A) a taxpayer whose personal efforts created such property * * *." See also § 1231(b)(1)(C). We see no error in the Tax Court's regarding the California decision as determinative of the issues there decided,[1] and we agree that Kurlan's

---

1. Taxpayer's contrary argument, based on the fact that the Commissioner was not a party to the California litigation and thus was not bound by it, overlooks the wide breach in the mutuality rule as to collateral estoppel opened by Justice Traynor's decision in Bernhard v. Bank of America Nat. Trust & Sav. Ass'n, 19 Cal.2d 807, 122 P.2d 892 (1942), which we followed in Zdanok v. Glidden Co., 327

F.2d 944, 954–956 (2 Cir.), cert. denied, 377 U.S. 934, 84 S.Ct. 1338, 12 L.Ed.2d 298 (1964). Taxpayer contends also that the California decision was not a final judgment, but, as we pointed out in Lummus Co. v. Commonwealth Oil Ref. Co., 297 F.2d 80, 89–90 (2 Cir. 1961), cert. denied, Dawson v. Lummus Co., 368 U.S. 986, 82 S.Ct. 601, 7 L.Ed.2d 524 (1962), and again in Zdanok, supra, 327

format or method of presentation falls within § 1221(3) (A), see Stern v. United States, 164 F.Supp. 847 (E.D.La. 1958), aff'd per curiam, 262 F.2d 957 (5 Cir.), cert. denied, 359 U.S. 969, 79 S.Ct. 880, 3 L.Ed.2d 836 (1959); Cranford v. United States, 338 F.2d 379 (Ct. Cl.1964). But the California decision, made on a demurrer, was an authoritative determination only as to those claims which Kurlan had pleaded in the California action, not as to what he had but did not plead.

What Kurlan may well have had in addition were infringement claims to vindicate the radio and television rights secured by McKenney's federal copyright. It is immaterial whether Kurlan's attorney omitted these claims in the California complaint because he lacked faith in them or because he feared that they were outside state court jurisdiction, 28 U.S.C. § 1338(a). Although the federal copyright did not confer a monopoly of the pretty-but-dumb and plain-but-bright combination, which was in the public domain, CBS' presentation may have approached the McKenney characters and their development so closely as to have infringed. See Nichols v. Universal Pictures Corp., 45 F.2d 119 (2 Cir. 1930), cert. denied, 282 U.S. 902, 51 S.Ct. 216, 75 L.Ed. 795 (1931). CBS evidently thought so; its lawyers insisted on a broad release of all claims for infringement, in which McKenney joined. Kurlan's partial interest in McKenney's copyright was not itself created by his "personal efforts" within § 1221(3) (A) even though he might have to utilize such efforts as well as employ actors and others to exploit it. See C. I. R. v. Ferrer, 304 F.2d 125, 132 (2 Cir. 1962).[2] Section 1221(3) (A) thus would not bar capital gain treatment for so much of the settlement as related to this interest and, if the other requirements of § 1231 were met, we would be obliged to remand for an allocation, as we did in C. I. R. v. Ferrer, supra, 304 F.2d at 135.[3]

Although we are thus not in full agreement with the Tax Court's opinion, we nevertheless affirm. Kurlan failed to make out another element essential to capital gain treatment, namely, that the gain was on a "sale or exchange" or "from the compulsory or involuntary conversion" of "property used in the

F.2d at 955, general expressions that only final judgments can ever have collateral estoppel effect are considerably overstated. In any event, in the absence of extraordinary circumstances, the Supreme Court of California would have applied its judgment as the law of the case on an appeal from a final judgment, Leese v. Clark, 20 Cal. 387, 416–420 (1862), and good sense would surely suggest that the Tax Court accept the views of the distinguished justices of that court as to California law rather than attempt its own assessment on an issue that had so divided the experts.

2. The scanty record makes it impossible to determine whether in view of the later assignment from McKenney capital gain treatment might be wholly or partially excluded by virtue of § 1221(3) (B), which denies this to "a taxpayer in whose hands the basis of such property is determined, for the purpose of determining gain from a sale or exchange, in whole or in part by reference to the basis of such property in the hands of the person whose personal efforts created such property." See 3B Mertens, Federal Income Taxation § 22.19, at 103–04 (Zimet & Weiss rev. 1958). In view of the ground on which we place our decision, we are not required to decide whether this point, not raised in the Tax Court or here, would be open to the Commissioner on a remand. See Hormel v. Helvering, 312 U.S. 552, 61 S.Ct. 719, 85 L.Ed. 1037 (1941).

3. It might be urged that the taxpayer's burden of proof required him to establish this allocation at the initial hearing in the Tax Court. But it would seem unreasonable to require a taxpayer who insists he is entitled to treat the whole of a transaction as a capital gain also to come forward with evidence as to what portion should be so treated if the Tax Court or a reviewing court should reject his maximum claim but nevertheless consider that the deficiency determined by the Commissioner was excessive. Decisions remanding for allocation appear to support that view. See Helvering v. Taylor, 293 U.S. 507, 55 S.Ct. 287, 79 L.Ed. 623 (1935); Ditmars v. C. I. R., 302 F.2d 481, 488–489 (2 Cir. 1962); C. I. R. v. Ferrer, supra.

trade or business." Internal Revenue Code of 1954, § 1231(a). In C. I. R. v. Ferrer, supra, 304 F.2d at 130–133, after reviewing the cases on "sale or exchange," we approved decisions which refused to deny such recognition to what amounted to a conveyance of a lesser estate simply because this was to the holder of a larger one who wanted to get rid of the lesser interest rather than to a stranger who wished to use it, the fact that the transfer was thus couched in language of surrender or cancellation rather than of sale not being fatal. But that does not go far enough to cover the transaction here. The settlement did not convey to CBS any interest in the copyright; Kurlan and McKenney simply released claims for past infringement and allowed similar future radio or television use by CBS, retaining their rights against all others. The collapsing of claims to past and future royalties into a lump sum payment does not render the transaction a sale, compare C. I. R. v. Gillette Motor Transp., Inc., 364 U.S. 130, 134–135, 80 S.Ct. 1497, 4 L.Ed.2d 1617 (1960); C. I. R. v. P. G. Lake, Inc., 356 U.S. 260, 78 S.Ct. 691, 2 L.Ed.2d 743 (1958); Holt v. C. I. R., 303 F.2d 687 (9 Cir. 1962). Although the Commissioner has been driven back in his battle against capital gain treatment for transfer of anything less than the whole copyright, and the grant of exclusive licenses in one geographic area or in one entertainment medium may give rise to capital gain, see 3B Mertens, Federal Income Taxation § 22.132, at 576–581 (Zimet & Weiss rev. 1958); compare Fulda, Copyright Assignments and the Capital Gains Tax, 58 Yale L.J. 245 (1949), the tide has not gone so far as to include within "sale or exchange" the transfer of a nonexclusive right to copy, even though this be valuable and for the entire life of the copyright and in return for a lump sum,

see E. I. Du Pont De Nemours & Co. v. United States, 288 F.2d 904, 911–912 (Ct. Cl.1961); cf. Walen v. United States, 273 F.2d 599, 602 (1 Cir. 1959). But cf. Kavanagh v. Evans, 188 F.2d 234 (6 Cir. 1951). Even more clearly taxpayer fails to bring himself within the alternative of "compulsory or involuntary conversion (as a result of destruction in whole or in part, theft or seizure, or an exercise of the power of requisition or condemnation or the threat or imminence thereof) * * *" An argument similar to Kurlan's has been firmly rejected in a patent infringement case, see Mathey v. C. I. R., 10 T.C. 1099 (1948), aff'd, 177 F.2d 259 (1 Cir. 1949), cert. denied, 339 U.S. 943, 70 S.Ct. 797, 94 L.Ed. 1359 (1950). Despite infringement, a copyright or patent remains with its true owner who may always seek injunctive relief against further misuse. Nor is it profitable to argue that the completed infringement represents a partial involuntary taking; the rule that damages for infringement are as much ordinary income as the royalties they replace cannot be overcome by the very general language of § 1231(a), see Mathey v. C. I. R., supra; Triplex Safety Glass Co. of North America v. Latchum, 44 F.Supp. 436 (D.Del.), aff'd per curiam, 131 F.2d 1023 (3 Cir. 1942). If this rule may sometimes lump in one year profits properly allocable to several, Congress may be prevailed upon to provide relief, compare Internal Revenue Code of 1954, §§ 1301–1304. Taxpayer has not pointed to anything in the legislative history or to any authority that would support the unusual reading of the language for which he contends. See Dear Publication & Radio, Inc. v. C. I. R., 31 T.C. 1168 (1959), aff'd, 274 F.2d 656 (3 Cir. 1960); Hitke v. C. I. R., 296 F.2d 639 (7 Cir. 1961).

Affirmed on taxpayer's petition; Commissioner's petition dismissed.