Mildred Kennedy v. Commissioner.
Kennedy v. Commissioner
Docket No. 5323-63.
United States Tax Court
T.C. Memo 1965-228; 1965 Tax Ct. Memo LEXIS 102; 24 T.C.M. (CCH) 1155; T.C.M. (RIA) 65228; August 24, 1965
*102 Mildred Kennedy, pro se, 100 W. 57th St., New York, N. Y. J. Q. Smith and Colin MacDonald, for the respondent. FAY
Memorandum Findings of Fact and Opinion FAY, Judge: The Commissioner determined deficiencies in petitioner's income tax as follows: Additions to Tax
Taxable
Sec. 294(d)(1)(A),
Year
Deficiency
1939 Code
1953
$ 7,812.98
$703.17
1954
7,473.42
674.91
1955
11,315.49
1956
9,091.66
The only issue for decision [1] is whether sums received by petitioner from the estate of her deceased husband represent capital gain or ordinary income. Findings of Fact Some of the facts have been stipulated, are so found, and the stipulation of facts, together with the exhibits attached thereto, is incorporated herein by this reference. Petitioner is an individual with residence *103 in New York City. She is the surviving wife of Thomas J. Kennedy (hereinafter referred to as the decedent), who died on August 9, 1951. Petitioner filed her Federal income tax returns on the cash basis of accounting and on the basis of a calendar year. Her returns for the years in issue were filed with the district director of internal revenue, Upper Manhattan, New York, New York. Decedent during his lifetime was sometimes a theatrical agent. He secured engagements for his clients in the theatrical and radio fields. As a hobby and pastime, the decedent would amuse himself by developing formats and writing scripts for radio and television programs. These were worked on during spare hours at home for fun and relaxation. Sometimes the petitioner would participate. More often than not, these projects were never completed. Prior to 1945, none of these projects were ever sold. This was not a regular trade or business of the decedent, and he had no regular customers for these projects. About 1940 decedent developed an idea for a radio program. He reduced this idea to writing in the form of a radio format or audition, and in 1944 he filed the audition as a dramatic composition under the *104 title "Break the Bank" with the Copyright Office of the United States of America, The Library of Congress, Washington, D.C. A. copyright for 28 years was issued on April 14, 1944, in the name of decedent. In 1945 decedent's health began to fail, and he was unable to work as a theatrical agent. He then was employed as a manager of a U.S.O. show and began to make efforts to place the "Break the Bank" show in the radio medium. He entered into negotiations with Wolf Associates, Inc., New York, New York, (hereinafter referred to as Wolf) and on August 1, 1945, a letter agreement was entered into as follows: Let this serve as an understanding between us: It is agreed that Wolf Associates, Inc. shall have the exclusive right to offer the property called, "Break The Bank" which you claim to be your property for a period of ninety days from this date. In the event of a sale, the profits shall be divided equally between us, after all the necessary expenses for the operation of the show are deducted. It is further understood that we will try to improve the present format and script of this property along the lines that we have discussed. If after the ninety day period, the original *105 property should revert to you and you decide you would like to make use of the improvements we have brought about, you shall have the right to such use, provided that we shall receive 5% of the selling price of your show. Wolf found a radio sponsor and on October 1, 1945, decedent and Wolf entered into the following letter agreement: For, and in consideration of, the payments hereinafter set forth and other valuable considerations, you hereby grant us all right, title, and interest in the title and idea which you have previously submitted to us called, "Break The Bank" and agree to hold us harmless from any and all claims in connection therewith. We have informed you that we have worked out a playable and saleable show and that we are negotiating with a nationally known sponsor, and contemplate closing a deal with them for a radio show to start in the very near future. Such contract will contain the usual thirteen week renewal clauses and the payments to be made to you are subject thereto. In the event we consummate a contract with a sponsor within sixty days, we agree to pay you $100.00 per broadcast for the first thirteen weeks of broadcasting; $150.00 per broadcast for the *106 next twenty-six weeks of broadcasting; $200.00 per week for the next twenty-six weeks of broadcasting, unless we shall receive a firm $500.00 increase from the sponsor at the end of thirty-nine weeks, in which event we agree to pay you $250.00 instead of $200.00. Whenever we shall receive $3500.00 per week or more for the radio program, you shall receive a flat 10% of the gross sum instead of the above stipulated sums. In the foregoing, the average amount for the first thirty-nine weeks of broadcasting would be $133.33. During this period we agree to pay you this sum for each broadcast, starting with the first week. All payments will be made ten days following the date of broadcast. In the event "Break The Bank" reaches any other field, other than radio, which is covered by the foregoing, it is agreed that you shall receive a flat 10% of the gross revenue therefrom. This agreement supersedes any prior agreements between us. If the above meets with your complete understanding, kindly sign below the words, agreed to and accepted by. Very truly yours, WOLF ASSOCIATES, INC., By /s/ EDWARD WOLF AGREED TO AND ACCEPTED BY: /s/ TOM KENNEDY The radio show "Break the Bank" *107 was successful. "Break the Bank" started out as a radio program sometime during the latter part of 1945 and continued as such until about October 1949. At this time it also became a daytime television show. Around the latter part of September 1950 "Break the Bank" became a nighttime show. During this period and afterwards "Break the Bank" grew in popularity as a radio and television show. Between August 9, 1951, and April 30, 1957, Wolf made payments to decedent's estate aggregating $263,188.51 pursuant to contract. "Break the Bank" was discontinued as a radio and television program on or about April 30, 1957. Periodically modification contracts of the October 1, 1945, contract were entered into between decedent and Wolf. Thus, on July 17, 1946, Wolf agreed to pay decedent $150 per week (broadcast), although it was not obligated to pay but $133.33 since the first 39 weeks of broadcasting had not been completed. On October 14, 1946, decedent was paid $200 for the October 4, 1946, show. By letter dated October 21, 1946, Wolf agreed to pay decedent $250 per broadcast commencing with the broadcast of October 4, 1946, and until such time as Wolf received $3,500 per week, exclusive of *108 prize money, when decedent would receive a flat 10 percent of the gross, exclusive of prize money. In 1949 and 1950 with the advent of television and the incorporation of "Break the Bank" into television, modification contracts were entered into varying the terms of the October 1, 1945, contract. At the time of the death of decedent, there existed three contracts between Wolf and sponsors for "Break the Bank," all of which contained the standard cancellation clause which allowed the sponsor to cancel at the end of each 13-week period. These contracts were: Sponsor
Period of Contract
Type of Broadcast
Day and Time of Show
Bristol-Myers Co.
9/20/50 to 2/ 1/53
Nighttime Television
Wednesday, 10 p.m.
N.B.C.
9/25/50 to 9/30/51
Daytime Radio
Tuesday and Thursday,
11 a.m.
Bristol-Myers Co.
9/25/50 to 3/20/53
Across the Board
Monday, Wednesday, and
Friday, 11 a.m.
There had been accrued and earned under these contracts certain sums, and there was due and owing to decedent on account thereof under his Wolf contract the sum of $383.33 at the time of his demise. This $383.33 was included as part of his gross estate on decedent's estate *109 tax return. On December 19, 1952, his executors filed decedent's estate tax return using an alternate valuation date, and valuing his contract with Wolf at $100,000. No value was placed upon any right of reverter or retained interest in the radio show or the copyrighted dramatic composition of "Break the Bank." On such return there was reported a gross estate of $110,749.71, deductions of $6,344.80, and a marital deduction of $52,202.46 to his surviving widow, petitioner herein, so that no net taxable estate remained after specific exemptions, and no estate tax was paid. Under decedent's will admitted to probate, and after payment of his debts and specific bequests, decedent directed that the residue of his estate be parceled out among his heirs as follows: Name
Relationship
Percentage
Petitioner
Wife
55
Thomas K. Kennedy
Son
10
Sheila Kennedy
Granddaughter
10
Margaret McDonald
Sister
8
Helen Reid
Sister
8
Mary C. Kennedy
Sister
9
The executor of decedent's estate filed fiduciary income tax returns for the estate on the basis of a fiscal year ended April 30. On such returns amounts received from Wolf were treated on the "return of capital" *110 basis until the amount of $100,000 had been received, and thereafter the excess was reported as distributable long-term capital gain. The estate of decedent received and reported under the Wolf contract the following sums for the fiscal years 1953 through 1956, which sums were distributed to the residuary legatees entitled thereto: Taxable
Reported as
Year Ended
Amount
Distributable
April 30
Received
Income
1953
$37,220.00
1954
38,954.30
$ 3,088.82
1955
75,646.79
67,864.38
1956
61,517.64
57,112.17
On a fiscal year basis, the respondent computed the legatees' distributable share of the gross income received by decedent's estate for the fiscal years 1953 through 1956, as follows: Taxable Year Ended April 30
Percent
Name
Allocable
1953
1954
1955
1956
Petitioner
55
$20,471.00
$21,424.85
$41,605.74
$33,834.71
Thomas J. Kennedy
10
3,722.00
3,895.43
7,564.68
6,151.76
Sheila Kennedy
10
3,722.00
3,895.43
7,564.68
6,151.76
Mary C. Kennedy
9
3,349.80
3,505.89
6,808.21
5,536.58
Helen Reid
8
2,977.60
3,116.35
6,051.74
4,921.42
Margaret McDonald
8
2,977.60
3,116.35
6,051.74
4,921.41
Total
$37,220.00
$38,954.30
$75,646.79
$61,517.64
*111 Also on a fiscal year basis, respondent computed the legatees' distributable share of the net income of decedent's estate for the years 1953 through 1956, as follows: Taxable Year Ended April 30
Percent
Name
Allocable
1953
1954
1955
1956
Petitioner
55
$20,592.63
$21,549.53
$37,325.41
$31,411.69
Mary C. Kennedy
9
3,369.70
3,526.28
6,107.79
5,140.10
Thomas J. Kennedy
10
3,744.12
3,918.10
6,786.44
5,711.22
Margaret McDonald
8
2,995.29
3,134.48
5,429.15
4,568.97
Helen Reid
8
2,995.29
3,134.48
5,429.15
4,568.97
Sheila Kennedy
10
3,744.11
3,918.10
6,786.44
5,711.22
Total
$37,441.14
$39,180.97
$67,864.38
$57,112.17
The foregoing totals were derived as follows: Taxable Year Ended April 30
1953
1954
1955
1956
Income from Wolf
$37,220.00
$38,954.30
$75,646.79
$61,517.64
Interest income
221.14
226.67
231.31
257.41
Total gross income
$37,441.14
$39,180.97
$75,878.10
$61,775.05
Less deductions
8,013.72
4,662.88
Distributable net income
$37,441.14
$39,180.97
$67,864.38
$57,112.17
Petitioner's distributable share of this net income for the years *112 1953, 1954, 1955, and 1956 was $20,592.63, $21,549.53, $37,325.41, and $31,411.69, respectively. Petitioner during the years 1952 and 1953 [2] did not treat any distributions from decedent's estate as taxable income to her. During 1954 she reported only a small portion of the total distribution as a capital gain. [3] In 1955 and 1956 petitioner reported the total distributions as capital gains. For all years in issue respondent has determined that the distributions received by petitioner constituted ordinary income. Opinion Petitioner maintains that the agreement between decedent and Wolf was for the sale of the title "Break the Bank" and not the sale of a script, format, or audition for a radio program. Petitioner argues that the title "Break the Bank" is a capital asset, *113 like a trademark, resulting in capital gain when sold. Respondent, on the other hand, contends that decedent sold all his right, title, and interest in the title and idea for a dramatic composition by the name of "Break the Bank," which under sections 117(a)(1)(C) of the Internal Revenue Code of 1939 and 1221(3) of the Internal Revenue Code of 1954 does not qualify as a capital asset. Accordingly, respondent maintains that all distributions received by petitioner during the four years in issue constituted ordinary income. We agree with respondent. Both respondent and petitioner agree that the decedent sold something to Wolf. Whether what was sold was a capital asset is the question here for decision. The agreement of October 1, 1945, set out in full in our Findings of Fact clearly indicates that decedent sold to Wolf all his "right, title and interest in the title and idea * * * 'Break the Bank'." Decedent created a format for a quiz program. He gave it the title "Break the Bank." This format was reduced to writing and sent to the Copyright Office of the United States. A Certificate of Copyright Registration was issued to decedent on April 14, 1944. It *114 was this idea of decedent's, a format for a quiz program, which was sold to Wolf. Both sections 117(a)(1)(C) of the 1939 Code and 1221(3) of the 1954 Code exclude from capital assets a copyright, a literary, musical, or artistic composition, or similar property, held by * * * a taxpayer whose personal efforts created such property, * * * Clearly, what decedent sold to Wolf falls within the exclusion of a capital asset contained in the above-quoted section. Kurlan v. Commissioner, 343 F. 2d 625 (C.A. 2, 1965), affirming a Memorandum Opinion of this Court; Cranford v. United States, 338 F. 2d 379 (Ct. Cl., 1964); Stern v. United States, 164 F. Supp. 847 (E.D. La. 1958), affd. per curiam 262 F. 2d 957 (C.A. 5, 1959). Petitioner's contention that all decedent sold to Wolf was the title "Break the Bank," which is separate and apart from decedent's format for the radio program, is not supported by the evidence of record. While it may be true that Wolf improved upon decedent's format or even changed it completely, the fact remains that Wolf did purchase all of decedent's right, title, and interest in his title and idea. If Wolf wanted *115 to purchase only the title, it seems that an agreement to this effect could have been entered into. But that was not the agreement finally entered into on October 1, 1945. Furthermore, if petitioner were correct in that all Wolf bought was the title "Break the Bank," she still would not prevail here. Before capital gains treatment will be afforded to a sale there must be a sale of "property." Whether a title by itself can be considered property is at best doubtful. Harold L. Regenstein, 35 T.C. 183, 190 (1960); Stern v. United States, supra, at 852. Nor are we persuaded by petitioner's contention that what decedent sold was a trademark or more accurately a service mark which qualifies as a capital asset. Decedent did not apply for registration of a trademark nor could he have obtained registration of a service mark since the latter term first became part of the United States Code on July 5, 1946, with effective date of July 5, 1947, Title 15 U.S.C.A. section 1053, which was subsequent to the date of sale involved herein. In any event, petitioner has failed to establish that the title "Break the Bank" as used in this case could be considered *116 a trade name or trademark. Cf. Title 15, U.S.C.A. section 1051. Decision will be entered for the respondent. Footnotes
1. Petitioner did not discuss in her opening statement nor did she introduce any evidence regarding the addition to tax under section 294(d)(1)(A), Internal Revenue Code of 1939↩, for the years 1953 and 1954 asserted by respondent. Petitioner failed to discuss this issue on brief. Accordingly, we treat the issue as having been abandoned by petitioner.
2. Petitioner initially took the position that the first $55,000 received from the estate of her deceased husband was tax free, representing her proportionate share of the $100,000 hasis used by the estate. Petitioner, having failed to argue this at trial or on brief, has apparently abandoned her claim that she is entitled to treat a part of the distribution as a return of basis. ↩
3. See footnote 2, supra.↩