The NESTLE COMPANY, INC.

v.

CHESTER'S MARKET, INC., and Saccone's Toll House, Inc.

Civ. No. H–82–445.

United States District Court, D. Connecticut.

Aug. 23, 1983.

Thomas J. Ward, Michael A. Grow and Niles V. Montan, Washington, D.C., John F. Murphy, Jr., Stephen E. Goldman and Susan P. McHugh, Robinson, Robinson & Cole, Hartford, Conn., for plaintiff.

Ralph C. Dixon and Richard Reynolds, Day, Berry & Howard, Hartford, Conn., Barry H. Garfinkel, Herbert F. Kozlov and Jonathan J. Lerner, Skadden, Arps, Slate, Meagher & Flom, New York City, Dominic J. Ferraina, Windsor, Conn., for defendants.

## RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

BLUMENFELD, Senior District Judge.

This is an action for trademark infringement and unfair competition brought by The Nestle Company, Inc. stemming from the concurrent use of the term "Toll House" by Nestle and defendant Saccone's Toll House, Inc. Nestle is the owner of five federally registered trademarks for Toll House: for chocolate, for cookies, for cookie mix, for spice flavored and butterscotch flavored morsels, and for prepared edible chocolate. Defendant Saccone uses Toll House in its corporate name, as the name of the inn it owns and operates, and in connection with the cookies it bakes and sells. These cookies are allegedly sold at, among other places, defendant Chester's Market, Inc., a grocery store in East Windsor, Connecticut. It is, of course, the use of Toll House on the cookies that Saccone sells that has caused Nestle to initiate this lawsuit.

The matter is before this court on the motion of the defendants for summary judgment dismissing plaintiff's complaint in its entirety, cancelling plaintiff's Toll House trademark registrations and granting defendants judgment on some of their counterclaims and affirmative defenses. There are three separate grounds for granting summary judgment: (1) that the term Toll House is generic; (2) that Nestle has never acquired enforceable trademark rights or has abandoned any rights it may once have had to use Toll House on cookies, cookie mix, cake mix, and butterscotch morsels; and (3) that the plaintiff was never entitled to register Toll House because the conveyance to plaintiff of the right to use the term was invalid in that it failed to transfer any of the goodwill associated with the term. Although the defendants' original motion papers sought the cancellation of all of Nestle's Toll House trademark registrations, counsel at oral argument on the motion limited the motion to the cancellation of the Toll House registration for cookies. [Transcript, at 42, 49.]

## I. BACKGROUND

### A. *Origin of The Term Toll House*

Insight into the meaning of Toll House as a trademark is gained by examination of its history. Both Nestle and Saccone derive their uses of the term Toll House from the Toll House Inn in Whitman, Massachusetts.

Ruth Wakefield, along with her husband, founded the inn in the 1930's in a house which once functioned as a toll house on the road between Cape Cod and Boston. In the late 1930's Mrs. Wakefield earned a place in American folklore through her invention of a cookie recipe. According to legend, the invention was a fortuitous accident. One day Mrs. Wakefield decided to add bits of semi-sweet Nestle chocolate to her traditional butter cookie dough, expecting to end up with chocolate cookies. The bits, however, held their shape and a new cookie was born. The name given this cookie at the time is a matter of dispute. According to Saccone, this cookie was named and became famous as the Toll House cookie. Nestle prefers the designation chocolate chip cookie for the purpose of this litigation, but in its advertising and promotional efforts it has long referred to the cookies made using Mrs. Wakefield's recipe as Toll House cookies.

Under whatever name, the home baking of these cookies in the Whitman, Massachusetts, area became so popular that sales of the crucial ingredient, Nestle's semi-sweet chocolate, increased in that area. This phenomenon attracted the attention of Nestle's predecessor, Lamont, Corliss & Company. Beginning in 1939, the Wakefields entered into a series of agreements giving Lamont exclusive rights to use the name Toll House in connection with chocolate and food products. Mr. and Mrs. Wakefield also agreed to give Lamont advice and suggestions on recipes involving chocolate. In 1948 Lamont, Corliss gave the Wakefields permission to use the Toll House name on cookies.

The Wakefields continued to operate the Toll House Inn until approximately 1968, at which time it was sold to the Noel family. In 1972 the Saccone family acquired the inn and they now operate it as a restaurant and bakery business.

### B. The Development of Toll House

Lamont began selling chocolate under the name Toll House. To save the bakers the chore of chopping up the bar form, it was soon selling pre-packaged pieces of choco-

late it called morsels. These Toll House chocolate morsels are today one of the most widely sold food products in the United States. Over $1 billion of morsels have been sold over the past ten years. Advertising and promotional expenses for the morsels have totaled more than $140 million during this time. Approximately 70% of the morsels sold in the United States end up in home-baked cookies. Consequently, much of this advertising has emphasized the use of the morsels as a cookie ingredient. Nestle does not dispute that it has used Toll House as a recipe title for home-baked cookies as well as a brand name for packaged cookies.

Nestle claims that Lamont, Corliss sold packaged Toll House cookies in Woolworth stores and other retail outlets throughout the country in the 1940's. Lamont was merged into the Nestle Co., Inc. in 1952. From the 1960's to 1980 Nestle claims Toll House cookies were sold in White Plains, New York. Finally, much more substantial volumes of Toll House cookies have allegedly been sold since 1980 at Walt Disney World under an agreement with Nestle.

## II. THE TEST FOR GENERICNESS

Section 14(c) of the Lanham Act, 15 U.S.C. § 1064(c), provides for the cancellation of a trademark if "at any time [it] becomes the common descriptive name of an article or substance." Courts commonly label such terms generic. *See, e.g., Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4, 9 (2d Cir.1976).

■ It is helpful to keep in mind some of the basic principles of trademark law. While many associations may be invoked by a word, the only one which is of any significance as a trademark is its use in denoting the source of the product it labels. *See Anti-Monopoly, Inc. v. General Mills Fun Group,* 611 F.2d 296, 304 (9th Cir.1979) (*Anti-Monopoly I*). "Source identification is the only word function which trademark law is designed to protect." *Id.* Trademarks enable buyers to differentiate between goods and services by their source,

thus rewarding the producer who provides consistent quality.

Used as a means of identifying the trademark owner's products, a trademark "makes effective competition possible in a complex, impersonal marketplace by providing a means through which the consumer can identify products which please him and reward the producer with continued patronage." ...

Moreover, once this goodwill is established, trademarks become an extremely important medium of advertisement. Provided that the public continues to understand the trademark term primarily as a source identifier, the particular producer is exclusively entitled to benefits flowing from the mark's sales appeal.

... But all of these legitimate trademark purposes derive ultimately from the mark's representation of a single fact: the product's source. *It is the source-denoting function which trademark laws protect, and nothing more.*

*Id.* at 301 (footnote omitted, emphasis added) (quoting *Smith v. Chanel, Inc.,* 402 F.2d 562, 566 (9th Cir.1968). It follows from this that "[i]f the primary significance of the trademark is to describe the type of product rather than the producer, the trademark has become a generic term and is no longer a valid trademark." *Anti-Monopoly I,* 611 F.2d at 304. Thus, "no matter how much money and effort the user of a generic term has poured into promoting the sale of its merchandise and what success it has achieved in securing public identification, it cannot deprive competing manufacturers of the right to call an article by its name." *Abercrombie & Fitch v. Hunting World,* 537 F.2d at 9.

The hoary case involving the cereal shredded wheat, *Kellogg Co. v. National Biscuit Co.,* 305 U.S. 111, 59 S.Ct. 109, 83 L.Ed. 73 (1938), is still one of the best examples of how the doctrine of genericness works. From 1895 to 1912, National Biscuit and its predecessor possessed a patent on the manufacture of the shredded, pillow-shaped, wheat biscuits. After 1912 National Biscuit conceded that it no longer possessed the exclusive right to make shredded wheat, but it claimed the exclusive right to make the biscuits pillow-shaped and to use the name Shredded Wheat to describe them. The district court agreed and issued an injunction forbidding Kellogg from either using the name Shredded Wheat or making pillow-shaped biscuits. The Supreme Court reversed.

The plaintiff has no exclusive right to the use of the term "Shredded Wheat" as a trade name. For that is the generic term of the article, which describes it with a fair degree of accuracy; and is the term by which the biscuit in pillow-shaped form is generally known by the public. Since the term is generic, the original maker of the product acquired no exclusive right to use it. As Kellogg Company had the right to make the article, it had, also, the right to use the term by which the public knows it.

*Id.* at 116–17, 59 S.Ct. at 112–13. Later on the Court stated:

[To] establish a trade name in the term "shredded wheat" the plaintiff must show more than a subordinate meaning [an association of the product with the plaintiff's factory] which applies to it. It must show that the *primary significance* of the term in the minds of the consuming public is not the product but the producer.

*Id.* at 118, 59 S.Ct. at 113 (emphasis added). *See also Feathercombs, Inc. v. Solo Products Corp.,* 306 F.2d 251, 256 (2d Cir.1962). As the Ninth Circuit noted in the *Anti-Monopoly I* opinions, "[t]he genericness doctrine has undergone little change since the *Shredded Wheat* case." 611 F.2d at 302 (footnote omitted). Some of the more well-known instances of its application include: *King-Seeley Thermos Co. v. Aladdin Industries, Inc.,* 321 F.2d 577 (2d Cir.1963) (thermos bottle); *Dupont Cellophane Co. v. Waxed Products Co.,* 85 F.2d 75 (2d Cir. 1936), *cert. denied,* 304 U.S. 575, 58 S.Ct. 1047, 82 L.Ed. 1539 (1937); *Bayer Co. v.*

*United Drug Co.,* 272 F. 505 (S.D.N.Y.1921) (aspirin).[1]

## III. PROPRIETY OF SUMMARY JUDGMENT

### A. *Rule 56(f) Assertion*

Rule 56(f) allows a party opposing summary judgment to submit an affidavit to the court stating "that he cannot for reasons stated present by affidavit facts essential to justify his opposition . . . ." However, the Second Circuit has held that the " 'bare assertion' that the evidence supporting a plaintiff's allegation is in the hands of the defendant is insufficient to justify a denial of a motion for summary judgment under Rule 56(f)." *Contemporary Mission, Inc. v. U.S. Postal Service,* 648 F.2d 97, 107 (2d Cir.1981). *Accord, Willmar Poultry Co. v. Morton-Norwich Products, Inc.,* 520 F.2d 289, 297 (8th Cir.1975), *cert. denied,* 424 U.S. 915, 96 S.Ct. 1116, 47 L.Ed.2d 320 (1976).

The Rule 56(f) affidavit of Michael Grow, counsel for Nestle, contains the following assertion:

> Based on the limited discovery taken to date, it is apparent that Plaintiff is unable to present certain facts essential to justify its opposition to the motion for summary judgment since those facts are in the exclusive possession of Defendant Saccone, its officers, employees and other persons, and may be obtained only through discovery.

Even if this "bare assertion" were not in itself insufficient as a matter of law, it is not possible that any evidence relating to the claims that (1) Toll House is generic, (2) Nestle has failed to use or abandoned the Toll House trademark, or (3) Nestle never acquired any valid trademark rights, would be in the exclusive possession of defendant Saccone. There is no merit in Nestle's argument that Saccone's own past actions,

e.g. the filing of trademark applications for Toll House cookies, constitute evidence that Toll House is not a generic term. The only way this evidence would raise an issue of material fact would be if Saccone's prior efforts to establish rights in the term in dispute estopped it from challenging its validity as a trademark. This legal position has been rejected by two Circuit Courts of Appeal. In *Keebler Co. v. Rovira Biscuit Corp.,* 624 F.2d 366 (1st Cir.1980), the court stated that:

> Under rule 8(e)(2) of the Federal Rules of Civil Procedure, a defendant may assert a counterclaim that is inconsistent with an affirmative defense raised by the same answer. . . . Similarly, rule 8(e)(2) permits a party to raise a defense that is inconsistent with a position taken under oath in a separate prior proceeding. . . . Thus, in the absence of any showing of bad faith, *see* Fed.R.Civ.P. 11, *[defendant's] affirmative defense of genericness was not barred by the federal rules, notwithstanding its seemingly inconsistent Puerto Rican trademark application.*

624 F.2d at 374 n. 7 (emphasis added). *See also Gimix, Inc. v. JS & A Group, Inc.,* 699 F.2d 901, 905 n. 2 (7th Cir.1983).

### B. *Rule 56 Standards*

▇ In opposing this motion, Nestle has argued that this court is virtually barred from granting summary judgment in complex trademark cases of this nature. There is, however, only one Rule 56 and it applies the same standards to trademark infringement and unfair competition cases that it applies to all other cases.[2] "[T]he mere fact that the issues may be complex is not a valid reason to deny summary judgment when there is no genuine issue as to any material fact, and the movant is enti-

---

1. For more recent examples, *see, e.g., National Conference of Bar Examiners v. Multistate Legal Studies, Inc.,* 692 F.2d 478, 487 (7th Cir. 1982); *Keebler Co. v. Rovira Biscuit Corp.,* 624 F.2d 366, 374 (1st Cir.1980); *Surgicenters of America v. Medical Dental Surgeries,* 601 F.2d 1011 (9th Cir.1979); *Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4 (2d Cir. 1976).

2. In *Gimix, Inc. v. JS & A Group, Inc.,* 699 F.2d 901 (7th Cir.1983), the Court of Appeals disagreed with the legal test applied by the district court in holding on summary judgment that "auto page" was generic, but it did not accept appellant's argument that the subject was particularly inappropriate for summary judgment. *Id.* at 905–06.

tled to judgment as a matter of law." *Zweig v. Hearst Corp.*, 521 F.2d 1129, 1136 (9th Cir.), *cert. denied*, 423 U.S. 1025, 96 S.Ct. 469, 46 L.Ed.2d 399 (1975). "When these requirements are met the procedure should be viewed with favor and applied according to its terms." 10 Wright, Miller & Kane, *Federal Practice & Procedure: Civil 2d* § 2712 at 590. Accordingly, no more stringent standard should be applied to the granting of summary judgment in a complex case. If "the facts are clear, the rule should be enforced." *Record Club of America, Inc. v. Columbia Broadcasting System*, 310 F.Supp. 1241, 1245 (E.D.Pa. 1970).

■ On summary judgment the moving party bears the burden of "'demonstrat[ing] the absence of any material factual issue genuinely in dispute.'" *American International Group, Inc. v. London American International Corp., Ltd.*, 664 F.2d 348, 351 (2d Cir.1981) (quoting *Heyman v. Commerce & Industry Insurance Co.*, 524 F.2d 1317, 1319–20 (2d Cir.1975)). Primarily using documentary proof from Nestle's own files, Saccone has fully met this burden. Surveys of consumer perceptions performed by or for Nestle clearly demonstrate that the primary significance of Toll House cookie in the minds of consumers is a type of cookie. The term is present in dictionaries and is even referred to as an "Americanism." As such Saccone has shown that the term enjoys widespread public usage. Furthermore, Nestle itself has always used the term to refer to a type of cookie, one made according to a certain recipe and using Nestle manufactured morsels as a principal ingredient. The only reasonable inference to be drawn from these facts is that Toll House cookie has lost any trademark significance that it may

have once had and is now merely a descriptive term for a type of cookie.[3]

■ Once the movant has carried its burden, summary judgment will be granted unless the party opposing the motion offers some evidence that could be presented at trial demonstrating that a genuine issue as to a material fact exists. 10A Wright, Miller & Kane § 2727 at 143. *See First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 289, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968). Although Nestle points to a number of its factual submissions as creating a genuine issue of material fact, it is apparent that whatever factual disputes they do raise are immaterial to the issue at hand. In order to successfully defeat summary judgment, the affidavits of the opposing party must not only present issues of fact, the issues must be of material fact. "A material fact is one which may affect the outcome of the litigation." *Commodity Futures Trading Comm. v. Savage*, 611 F.2d 270, 282 (9th Cir.1979).

## IV. THE FACTS ON GENERICNESS

### A. *Survey Evidence*

Since whether or not a trademark has become a generic term depends on its primary significance in the minds of the consuming public, consumer opinion surveys are often introduced in this type of case. Both Nestle and Saccone have chosen to submit survey evidence that allegedly supports their position.

Saccone conducted no surveys of its own, but relies instead on the results of a 1979 "Toll House Awareness Study" conducted by Nestle's own Marketing Research Department and a 1981 "Toll House Study" conducted for Nestle by its advertising

---

**3.** It is not necessary to decide whether Toll House was generic as applied to cookies before it was registered as a trademark for that product by Nestle. Applying the test used in *Anti-Monopoly, Inc. v. General Mills Fun Group*, 684 F.2d 1316, 1321 (9th Cir.1982), *cert. denied*, —— U.S. ——, 103 S.Ct. 1234, 75 L.Ed.2d 468 (1983) (*Anti-Monopoly II*), it probably was not. There may have been no cookie made with bits of semi-sweet chocolate before Mrs. Wakefield

baked one as there was no Monopoly before someone devised it. Yet the fact that the game had only been played and called by its name by a small group of people meant that Parker Brothers could appropriate the name and register it as a trademark. 684 F.2d at 1321. Nestle registered a trademark for cookies in 1940, a point at which the baking of cookies using Mrs. Wakefield's recipe was limited to the New England area.

agency, N.W. Ayer ABH International. These documents were obtained from Nestle in discovery and have been the subject of a confidentiality order of this court. Nestle objects to the admission of what it calls "fragmentary excerpts" from the two documents on the grounds that (1) Saccone has failed to provide a proper foundation for their admission, and (2) that they have no probative value on the issue of genericness. Nestle has not disputed the authenticity of the documents and has attached the identical documents as Exhibits 30 and 31 to the affidavit of Frank J. Arthofer, Vice President of Marketing for Nestle, in an attempt to show that the surveys contained in them were not designed to determine genericness.

Nestle has submitted four public opinion surveys that were commissioned for the purposes of this motion. Saccone objects to the admission of all four surveys on the ground of lack of adequate foundation. The first three surveys were submitted in affidavit form prior to the hearing on the defendants' motion for summary judgment. The fourth survey was submitted in affidavit form and attached to a supplemental brief by Nestle that was filed one month after the date of the hearing; Saccone objects to the admission of this survey on the ground that the affidavit was not timely filed.

### 1. Description

#### a. 1979 Toll House Awareness Study [Arthofer Exhibit 30]

In 1979 a marketing survey was conducted by or for Nestle's Marketing Research Department in order to help guide the company's future participation in the baking market. One hundred personal interviews were conducted of women between the ages of 18 and 49 with children living at home who had baked chocolate chip cookies at home as well as cakes and/or brownies. Respondents were first asked about their awareness of the Toll House name: 93% said that they had heard the name associat-

ed with baked goods and the remaining 7% had heard of Toll House cookies. The following question was then asked: "When you hear the name, 'Toll House,' what does it mean to you? What else do you think of?"

The results were:

| | |
|---|---|
| Chocolate Chip Cookies | 79% |
| Chocolate bits/pieces | 35% |
| Nestles (chocolate bits) | 9% |
| A good quality, dependable product | 7% |

A variety of other smaller percentage responses was also obtained.[4] In the section entitled "Detailed Findings," the study concludes: "The primary association with the Toll House name, as could be expected, relates to chocolate—chocolate chip cookies, chocolate bits, etc."

#### b. Toll House Development Labs Study [Arthofer Exhibit 31]

The other consumer perception evidence found in Nestle's files and relied on by Saccone in support of this motion is contained in a 1981 report, in the form of a letter, from Nestle's advertising agency, N.W. Ayer ABH International. Again, the purpose of the study was to test marketing ideas for new product lines. One hundred and thirty women were surveyed. In the section entitled "Key Findings," the report states that "[f]rom participant responses obtained during these groups, several general conclusions can be drawn regarding consumer expectations and perceptions of the Toll House Mix products." The following statement is found in one of the conclusions: "The Nestle name was strongly associated with Nestle Real Chocolate Morsels, while Toll House was associated with a traditional recipe for a specific chocolate chip cookie."

#### c. Scratch Baking Study [Arthofer Exhibit 29]

Nestle submitted a document summarizing the results of its own national surveys taken in 1975 and 1977 involving approximately 1300 women. This document was submitted in order to show that awareness

---

**4.** Total exceeds 100% due to multiple responses.

of the Toll House brand name was high, 93% in 1975 and 96% in 1977, and that there was a high association of Toll House with Nestle, 69% in 1975 and 77% in 1977. These surveys were also designed to gain information about the baking market.

### d. Dr. Robert C. Sorensen Affidavit

In this survey 500 randomly selected people between the ages of 18 and 65 who had purchased or eaten cookies during the 12 months prior to the interview were asked the following questions. Question 1:

Now I want to ask you about cookies that have small pieces of chocolate in them. I am talking about cookies that you or someone else might make or cookies that you or someone else might buy. My first question is this: If you were shopping or if you were talking with someone, what basic product word or words would you use in referring to cookies that have small pieces of chocolate in them?

Question 2: "Any other basic product words?" This question was asked of everyone who offered any answer to Question 1 (except "don't know" or "not sure").

The affidavit summarizes the replies:

(1) 13.8% of total survey respondents mentioned TOLL HOUSE; another 1.2% of total survey respondents said "Hershey TOLL HOUSE/Chocolate chip or TOLL HOUSE/TOLL HOUSE Nestle morsels/TOLL HOUSE, Betty Crocker, or Nestle's.

(2) 75.8% of all survey respondents specified chocolate chips or chips; 5.0% mentioned chocolate morsels/bits/nuggets/sprinkles/chunks; 8.4% said Nestle's/Nestle's chocolate chips/Nestle's bits.

(3) 8.2% mentioned other brands or companies; 8.4% offered other comments, mostly adjectives concerning taste; 3.2% said they did not know or were not sure.

This survey was modeled after the one accepted by the court in *American Thermos Products Co. v. Aladdin Industries, Inc.,* 207 F.Supp. 9 (D.Conn.1962), *aff'd sub nom., King-Seeley Thermos Co. v. Aladdin Industries, Inc.,* 321 F.2d 577 (2d Cir.1963).

### e. Dr. Cecile Johnston Affidavit

This was a random telephone survey of 500 persons attempting to ascertain the identification of Toll House as a brand name. The survey was modeled upon one approved by the court in *E.I. Dupont de Nemours & Co. v. Yoshida International, Inc.,* 393 F.Supp. 502 (E.D.N.Y.1975). The following question was asked in the Johnston survey:

First of all, I'd like to talk about different products that are used in the home. I am going to read a list of names to you. Some of the names are brand names of products and some are common names of products. As you know, a brand name is a special name that identifies the manufacturer or the source of a product, while a common name is a general category name for the product itself. For example, Chevrolet is a brand name, while automobile is a common name and Pepsi Cola is a brand name, while soft drink is a common name. As I read each name to you please tell me whether it is a brand name or a common name. The first/next name is (the names listed on the next page were then read individually).... Do you think (name) is a brand name or a common name?

The results were in part: [5] 67.4% of the respondents said Toll House was a brand name and 27.4% said it was a common name; 14.4% said aspirin was a brand name and 84.4% said it was a common name; 18.2% said cellophane was a brand name and 79.8% said it was a common name.

5. The remaining interviewees responded "don't know" or "both." The other names and responses are as follows.

| NAMES | BRAND NAME (%) | COMMON NAME (%) |
|---|---|---|
| Bleach | 8.4 | 89.4 |
| Lawn-Boy | 85.4 | 7.8 |
| Polaroid | 90.8 | 7.8 |

| NAMES | BRAND NAME (%) | COMMON NAME (%) |
|---|---|---|
| Detergent | 6.2 | 92.8 |
| Bread | 4.6 | 95.0 |
| Cooking Oil | 6.8 | 92.6 |
| Formica | 59.4 | 36.0 |
| Kleenex | 75.8 | 23.0 |
| Teflon | 60.4 | 35.8 |

### f. *Marguerite L. Rittenhouse Affidavit*

This was a consumer intercept survey conducted at a supermarket in Danbury, Connecticut, in which consumers were asked to identify four products that were placed before them. The four products were:

(a) Johnson & Johnson Band-Aid adhesive bandages;

(b) M & M plain candies;

(c) Original Toll House cookies produced by the defendant in this litigation;

(d) Nabisco shredded wheat.

Three hundred and thirty shoppers were asked to identify the products. The affidavit does not set forth exactly how the question was asked by Rittenhouse, who conducted the survey herself.

### g. *Richard Brumfield Affidavit*

This survey was made of 453 randomly selected persons, 18 years of age or older, who had made chocolate chip cookies using Toll House morsels in the last year. It asked the following questions:

> I'd like to talk to you about cookies baked at home. In the past year have you made chocolate chip cookies at home, or not?
>
> In the past year have you purchased Nestle TOLL HOUSE morsels for use in chocolate chip cookies, or not?
>
> Why did you purchase TOLL HOUSE morsels? For what other reasons?
>
> With regard to your purchase of TOLL HOUSE chocolate chips or morsels for use in baking cookies, which of the following statements best expresses why you buy the morsels?
>
> A. I buy TOLL HOUSE morsels because I believe I need that brand to bake TOLL HOUSE chocolate chip cookies. I care who makes them and I rely on the TOLL HOUSE trademark for quality.
>
> B. I buy TOLL HOUSE morsels because I need them to bake chocolate chip cookies. I don't care who makes them and I don't rely on the TOLL HOUSE trademark for quality.

Based on the results of the survey, the affidavit concludes that approximately 74% of the respondents "perceive TOLL HOUSE to be a trademark relied on for quality, that they care about the identity of the manufacturer and perceive a need to use TOLL HOUSE brand morsels in baking TOLL HOUSE chocolate chip cookies." [Brumfield Affidavit, ¶ 5.]

### 2. *Admissibility*

#### a. *Brumfield Affidavit*

■ This affidavit was filed on June 16, 1983, a month after the oral argument was held on May 16, 1983, and thus apparently in violation of Fed.R.Civ.P. 56(c). That rule states that the adverse party may serve opposing affidavits "prior to the day of hearing." However, this provision should be read in conjunction with Rule 6(d) which enables the court to permit affidavits in opposition to a motion to be served "at some other time." *See* 6 *Moore's Federal Practice* ¶ 56.14[1] (2d ed. 1982). Whether the affidavit should be admitted is solely within the court's discretion. *Wood v. Santa Barbara Chamber of Commerce, Inc.,* 705 F.2d 1515, 1516 (9th Cir.1983); *Dudo v. Schaffer,* 93 F.R.D. 524, 528 (E.D.Pa.1982); *Blackburn v. Prudential Lines, Inc.,* 454 F.Supp. 1302, 1306 (E.D.Pa.1978).

■ Nestle has not offered any explanation for its failure to comply with the time requirement of Rule 56(c). After the moving party Saccone was given the opportunity to file a reply brief after the date of the oral argument, Nestle asked for permission to supplement its initial brief opposing Saccone's motion for summary judgment. This request was granted in the interests of liberal pleading and fairness to the parties. Nestle in particular had pleaded the necessity to meet certain misrepresentations and novel legal issues that first surfaced at oral argument. There was no indication of any request to file a late affidavit in opposition in violation of Rule 56(c) nor was permission to do so in any way implied. The matter attempted to be addressed by the affidavit was clearly at issue at the time the original reply brief and affidavits were

submitted. Defendants' motion was filed on February 25, 1983, and the oral argument was not held until May 16, 1983. Given Nestle's failure to offer any explanation or justification for not filing one of its affidavits in opposition until a month later, that affidavit must be deemed inadmissible. To do otherwise would be bending even the liberal Federal Rules so out of shape as to have no meaning. *Blackburn v. Prudential Lines,* 454 F.Supp. at 1302.[6]

### b. *Survey Evidence in General*

 The use of consumer perception or opinion surveys is in technical conflict with the hearsay rule. This type of evidence is, however, of undeniable importance in a case of this kind as it is the most practical and useful way of assessing public opinion. *E.I. Dupont de Nemours v. Yoshida International,* 393 F.Supp. at 518; *Zippo Manufacturing Co. v. Rogers Imports, Inc.,* 216 F.Supp. 670, 684 (S.D.N.Y.1963). So under one rationale or another, survey evidence has been received into evidence in a large number of cases. Judge Feinberg's scholarly and well reasoned opinion in *Zippo Manufacturing Co.* remains the best exposition of a difficult and confusing subject.

Defendant objects to the admission of the surveys into evidence. It first contends that the surveys are hearsay. The weight of case authority, the consensus of legal writers, and reasoned policy considerations all indicate that the hearsay rule should not bar the admission of properly conducted public surveys. Although courts were at first reluctant to accept survey evidence or to give it weight, the more recent trend is clearly contrary. Surveys are now admitted over the hearsay objection on two technically distinct bases. Some cases hold that surveys are not hearsay at all; other cases hold that surveys are hearsay but are admissible because they are within the recognized exception to the hearsay rule for statements of present state of mind, attitude, or belief. Still other cases admit surveys without stating the ground on which they are admitted.

*Zippo Manufacturing v. Rogers Imports,* 216 F.Supp. at 682 (footnotes omitted). Judge Feinberg goes on to point out the less than satisfactory aspects of all these approaches and notes that well reasoned authority favors an approach that goes beyond the determination that a statement is hearsay. Instead,

there must still be a further examination of the *need for the statement at trial and the circumstantial guaranty of trustworthiness surrounding the making of the statement.* This approach has been used to justify the admissibility of a survey. Necessity in this context requires a comparison of the probative value of the survey with the evidence, if any, which as a practical matter could be used if the survey were excluded. If the survey is more valuable, then necessity exists for the survey, i.e., it is the inability to get "evidence of the same value" which makes the hearsay statement necessary.... [T]he inferences which can be drawn from the [testimony of witnesses] to the public state of mind are not as strong or as direct as the justifiable inferences from a scientific survey.

The second element involved in this approach is the guaranty of trustworthiness supplied by the circumstances under which the out-of-court statements were made.... While the sampling procedure substantially guarantees trustworthiness insofar as the respondent's sincerity is concerned, other survey techniques substantially insure trustworthiness in other respects. If questions are unfairly worded to suggest answers favorable to the party sponsoring the survey, the element of trustworthiness in the poll would be lacking. The same result would follow if the interviewers asked fair questions in a leading manner. Thus, *the methodology*

---

**6.** Even if it were to be admitted, the survey results contained in the Brumfield affidavit are irrelevant to any issue in this case. The study obviously ascertained only consumer motivation in purchasing Toll House chocolate morsels. The only issue of genericness involved in this motion concerns Toll House cookies.

*of the survey bears directly on trustworthiness, as it does on necessity.*

*Id.* at 683–84 (footnotes omitted, emphasis added). Accordingly, the proper test for accepting survey evidence is the dual bases of necessity and guarantee of trustworthiness. The former is clearly present. The presence of the latter is question of law for the court to decide and thus does not in itself create an issue of material fact.[7] Federal Rules of Evidence 803(24), 804(b)(5). *Toys "R" Us, Inc. v. Canarsie Kiddie Shop, Inc.,* 559 F.Supp. 1189, 1205 (E.D.N.Y.1983). In the *Toys "R" Us* case Judge Glasser applied a strict standard in evaluating the trustworthiness of another Sorensen survey, on the likelihood of confusion between plaintiff's mark, Toys "R" Us and defendant's mark, Kids 'r' Us.

The trustworthiness of surveys depends upon foundation evidence that (1) the "universe" was properly defined, (2) a representative sample of that universe was selected, (3) the questions to be asked of interviewees were framed in a clear, precise and non-leading manner, (4) sound interview procedures were followed by competent interviewers who had no knowledge of the litigation or the purpose for which the survey was conducted, (5) the data gathered was accurately reported, (6) the data was analyzed in accordance with accepted statistical principles and (7) objectivity of the entire process was assured. Failure to satisfy one or more of these criteria may lead to exclusion of the survey. . . .

The testimony regarding the survey as recounted above, together with the absence of any testimony by others who were responsible for the various parts of the survey falls far short of satisfying the foundation requisites and raised doubts in my mind concerning the trustworthiness of the survey serious enough to compel me to exclude it.

*Id.* at 1205 (citations omitted).

The decision to exclude the survey followed a trial during which Sorensen testified and described the steps taken in producing the survey. Judge Glasser found that the deficiencies in the manner in which the survey data was obtained and the failure of others involved in its preparation to testify raised serious doubts about its trustworthiness. The same standard may not necessarily be applicable to the circumstances present in this case. The requirements for laying a proper foundation by affidavit should logically be less comprehensive than those required when a trial is held. Furthermore, there is a line of case law favoring a less strict standard for admissibility. "In evaluating such surveys, especially when they are conducted by reputable professionals, as they were in this case, it is generally thought that any technical deficiencies ought to go to the weight accorded them and not to their admissibility into evidence." *E.I. Dupont de Nemours v. Yoshida International,* 393 F.Supp. at 518.

The problem lies in determining what is a "technical objection" and what is an objection so serious as to give doubts about the survey's essential trustworthiness. Part of the confusion results from the fact that the same factors that courts use to determine admissibility are also used to determine the weight that ought to be given survey evidence. *Dictaphone Corp. v. Dictamatic Corp.,* 199 U.S.P.Q. 437, 447 (D.Ore.1978). Thus, complaints about the proper universe and the circumstances under which a survey is taken have been used to determine that it is entitled to little or no weight.[8]

---

**7.** Affidavits in opposition to a motion for summary judgment must set forth admissible facts. *See, e.g., Applegate v. Top Associates, Inc.,* 425 F.2d 92, 97 (2d Cir.1970).

**8.** The court recognizes that "the weight to be given survey evidence is a task for the trier of fact." *Scotch Whiskey Association v. Consolidated Distilled Products, Inc.,* 209 U.S.P.Q. 130, 133 (N.D.Ill.1980). "This is so, in part, because an adverse party should be afforded an opportunity to examine someone responsible for the preparation of the survey as to the validity and reliability of the survey techniques used and to present rebuttal evidence on these points." *Id.* at 133–34. In *Grotrian, Helfferich, Schulz, Th. Steinweg Nachf v. Steinway and Sons,* 523 F.2d 1331, 1340 (2d Cir.1975), the Court of Appeals upheld the admissibility of survey evidence that

### c. *Nestle Commissioned Surveys*

Of the three timely submitted surveys, only one raises sufficient doubts about its trustworthiness that it must be ruled inadmissible. The Rittenhouse affidavit does not state the actual question posed to shoppers when they were asked to identify products, but even more troubling than this oversight is the fact that Rittenhouse herself conducted the survey after she had been contacted by the lawyers in this case. This fact casts sufficient doubt on the essential objectivity of the survey so as to make it untrustworthy. An important element in judging the trustworthiness of surveys is that the interview procedures were proper and unbiased. For example, in ruling that the Sorensen survey was inadmissible in the *Toys "R" Us* case, Judge Glasser relied heavily on the fact that not all the interviewers were unaware that the survey was being conducted for Toys "R" Us. 559 F.2d at 1204.

However, I cannot say that Saccone's objections to the Sorensen and Johnston surveys raise such substantial doubts about their trustworthiness so as to make them inadmissible as a matter of law. In this I differ somewhat from Judge Glasser's approach. I think it is preferable to say that if a survey was conducted by a professional in that field and is submitted by way of the affidavit of that person, then the objections present here, *i.e.* the failure to submit affidavits of persons who conducted parts of the survey, the fact that the universe was not properly defined, and the fact that the affidavit was submitted prior to the verification process, are not sufficient to bar admitting a survey into evidence.

### d. *Nestle Documents*

Nestle raises the same hearsay objections about Saccone's attempt to submit into evidence two surveys found in Nestle's files.[9] Nestle does not challenge the authenticity of the documents; indeed, the Arthofer Affidavit points to different conclusions in the same documents as support for Nestle's position that Toll House is not a generic term when applied to cookies. [Arthofer Affidavit, ¶¶ 32, 36.] Nestle claims that Saccone has not met its burden of establishing that the surveys were not conducted in accordance with accepted principles of survey research. However, Nestle does not offer any specific objections that went to any of the elements of trustworthiness, *i.e.,* objectivity, data analysis, and/or interview procedures. The only specific objection presented by Nestle is that the studies were not designed to determine whether Toll House is generic and therefore lack

the trial court had admitted, over hearsay objections, on the basis of necessity and the court's conviction of their trustworthiness. "There is substantial authority to support the admissibility of properly conducted surveys in trademark infringement cases, as well as other types of cases." *Id.* at 1341. The Second Circuit went on to say that the more relevant question was the weight to be given the surveys and that the district court had properly weighed their validity by evaluating competing testimony about methodology and conclusions. *Id.*

**9.** In fact, Nestle objects to the entire affidavit submitted by Barry Garfinkel, counsel for Saccone, as lacking personal knowledge. This affidavit serves to submit to the court documents produced in discovery by Nestle and various excerpts from other media articles and publications. In this case the attorney's affidavit does not provide an independent source for the determination of factual issues, but merely serves as a vehicle to identify exhibits. *See Frito Lay of Puerto Rico, Inc. v. Canas,* 92 F.R.D. 384,

391 (D.P.R.1981); *First National Bank Co. v. Insurance Co. of North America,* 606 F.2d 760, 766 (7th Cir.1979). Hence, any objections to the admission should go to the exhibits themselves. The two survey documents are admissible on the dual bases of necessity and trustworthiness. The other documents produced from Nestle's own files, the authenticity of which have not been challenged, consisting of internal memoranda and correspondence, are admissible as admissions. F.R.E. 801(d)(2). The media articles are self-authenticating under F.R.E. 902(2) and are admissible as evidence of public perception and usage. Thus, all the hearsay objections are not applicable. The other items, including dictionary and cookbook excerpts, are in any event a proper subject for judicial notice. The court may take judicial notice of facts concerning the generally accepted generic use of a term. *See Miller Brewing Co. v. G. Heileman Brewing Co.,* 561 F.2d 75, 80 (7th Cir.1977).

any probable value on that question. As that objection does not go to the surveys' trustworthiness, it will not be considered at this point.

It is Saccone's position that the surveys are admissible as admissions of a party opponent. *See Johnson & Johnson v. Colgate-Palmolive Co.,* 345 F.Supp. 1216, 1223–24 (D.N.J.1972). It is not necessary to reach that question because the surveys are admissible under the same approach of necessity and trustworthiness that applies to survey evidence in general. In fact, in this instance, less foundation evidence is required to satisfy the element of trustworthiness; the same standard should not apply when admitting survey evidence developed before litigation as is applied to surveys developed for the purposes of litigation. The former are inherently more trustworthy, especially when the results are against the developer's interest, as is the case here. There was a strong economic incentive for the people conducting the 1979 and 1981 studies to do a proper job, *i.e.* one that met accepted principles of survey research. There is no indication that they did not do so.

### 3. *Relevance*

The 1979 and 1981 marketing surveys conducted by Nestle and its advertising agency, regardless of their overall purpose, clearly probed the primary significance of the term Toll House in the minds of consumers. The results are fatal to the preservation of Nestle's trademark for Toll House cookies. Both studies concluded that to most consumers Toll House was associated with a type of product, *i.e.* a chocolate chip cookie made using a certain recipe, not the product of a specific manufacturer.

In contrast, the surveys commissioned by Nestle for this motion avoided asking any questions whose responses would be relevant to the proper test for genericness. For this reason, the Sorensen and Johnston surveys, although trustworthy and hence admissible, are not sufficient to raise an issue of material fact in this motion.

The question asked in the Sorensen survey has no bearing on the primary significance of Toll House cookies in the minds of consumers. The only reasonable inference that can be drawn from the results of that survey is that chocolate chip is a more frequently used generic term for cookies that have small pieces of chocolate in them than is Toll House. In paragraph 14 of his Affidavit # 1, Sorensen states that "Toll House is not commonly perceived or used by cookie purchasers and consumers as a generic term or common product word for cookies containing pieces of chocolate." This type of approach totally misconceives the legal test for genericness. It is not possible to show that Toll House is not a generic term by measuring the frequency of its use as a common descriptive term for a particular product. What is important is the primary significance of that word in the minds of consumers, not that they use another word more frequently in describing the same product.

All the Sorensen study could prove was that chocolate chip is a generic term just as a similar study in the *Thermos* case proved that thermos is a generic term. There the survey showed that a substantial majority (75%) of the adults in the United States who were familiar with that type of container called it a "thermos" while 11% used the term "vacuum bottle." *American Thermos v. Aladdin,* 207 F.Supp. at 21–22. Surely the study did not prove that vacuum bottle is not a generic term, as in this case it did not prove that Toll House is not a generic term for cookies.

On appeal in the *Thermos* case, the holders of that trademark argued that the existence of an alternative generic term for the product meant that the rule applied in the *Aspirin* and *Cellophane* cases did not apply. In rejecting this argument, the Second Circuit stated that "the test is not what is available as an alternative to the public, but what the public's understanding is of the word that it uses." The court noted that it was critical that "[t]he two terms had become synonymous: in fact, defendant's survey showed that the public was far more inclined to use the word 'thermos' to de-

scribe a container that keeps its contents hot or cold than the phrase 'vacuum bottle.' " *King-Seeley Thermos v. Aladdin Industries,* 321 F.2d at 580. Although the frequency of use is reversed in this case, *i.e.* chocolate chip is more common than Toll House, I do not think that this changes the result. If the primary significance of Toll House cookie in the minds of consumers is a type of cookie, it is a generic term although another generic term may be more frequently used to describe the same product.

■ To the extent that Sorensen's affidavit contains an opinion that Toll House is not the most commonly used product word for a cookie containing bits of chocolate, it has a basis in the facts submitted in his affidavit but does not raise an issue of material fact. To the extent that the affidavit goes beyond that and contains an opinion that Toll House is not a generic term for cookies, it need not be considered by the court. Conclusions of law or expert opinions without basis in the record cannot be relied upon to preclude summary judgment. *Sears, Roebuck & Co. v. American Plumbing & Supply Co.,* 19 F.R.D. 334, 339 (D.Wis.1956); *Merit Motors, Inc. v. Chrysler Corp.,* 569 F.2d 666, 672–73 (D.C.Cir.1977). The same is true for Sorensen's opinions on the relevance of the survey results and conclusions found in the Nestle documents to the legal test for genericness. [Sorensen Affidavit # 2, ¶¶ 3, 4.]

The Johnston survey also fails to raise an issue of material fact. Even if a brand name survey could under any circumstances be evidence to support a finding of genericness,[10] *see Anti-Monopoly Inc. v. General Mills Fun Group,* 684 F.2d 1316, 1323 (9th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1234, 75 L.Ed.2d 468 (1983) (*Anti-Mo-*

*nopoly II*), this particular survey suffers from a glaring defect. The key term on the list of names to be identified was simply Toll House. In order for the survey results to have any possible relevance to the issue in this case, the respondents would have to know that the interviewer was asking about Toll House cookies. However, respondents who indicated that Toll House was a brand name may very well have been thinking of Nestle's chocolate morsels, every package of which is sold with the Toll House trademark prominently displayed.[11] *See American Footwear Corp. v. General Footwear Co., Ltd.,* 609 F.2d 655, 661 n. 4 (2d Cir. 1979), *cert. denied,* 445 U.S. 951, 100 S.Ct. 1601, 63 L.Ed.2d 787 (1981).

The inapplicability of either the Johnston or the Sorensen surveys to the issues presented by this motion illustrates once more the point that each of these cases must be judged on its own unique facts. Merely duplicating a survey that was accepted in a previous trademark case is no assurance of relevance in another case. *See Anti-Monopoly II,* 684 F.2d at 1323.

### B. *Other Evidence*

#### 1. *Public Usage and Understanding*

##### a. *Dictionary Definitions*

The presence of a term in the dictionary is often treated by courts as persuasive evidence of how a term is understood and used by the consuming public. *See, e.g., Surgicenters of America, Inc. v. Medical Dental Surgeries Co.,* 601 F.2d 1011, 1015 n. 11 (9th Cir.1979). For example in *Miller Brewing Co. v. G. Heileman Brewing Co.,* 561 F.2d 75, 80–81 (7th Cir.1977), *cert. denied,* 434 U.S. 1025, 98 S.Ct. 751, 54 L.Ed.2d

---

**10.** In *Anti-Monopoly II* the court found fault with the survey because it defined brand name as a name made by one company, reasoning that since Monopoly was made only by one company, it would have to be construed as a brand name by the interviewees. 684 F.2d at 1323. This left open the question of whether one could construct a brand name survey that would not be so flawed, but would be probative of the primary meaning of the disputed term in the minds of consumers.

**11.** The same problem exists in relation to Nestle's reliance on the 1975 and 1977 Scratch Baking surveys to show a high awareness of the Toll House name. Moreover, the study states that 31% of the respondents in the 1977 survey spontaneously mentioned Toll House as a type of cookie made with chocolate baking pieces.

772 (1978), the Court utilized definitions in three editions of Webster's International Dictionary of "light" as an adjective to conclude that "light" is a generic or common descriptive term when used with "beer."

Evidence submitted by Saccone shows three entries for Toll House cookie in which the term is defined as a type of cookie.[12] In *Webster's New World Dictionary of the American Language, College Edition* (World Publishing Co. 1964), "tollhouse cooky" is defined as: "[made according to a recipe used at the Toll House in Whitman, Massachusetts] a kind of cooky containing bits of solid chocolate." [Garfinkel Affidavit, Exhibit 8.] Furthermore, the 1970 Second Edition of that dictionary further indicates that "tollhouse cookie" is an Americanism, *i.e.* a uniquely American word or phrase. [Garfinkel Affidavit, Exhibit 9.] The *Random House College Dictionary* (1975) defines "tollhouse cooky" as: "A crisp cooky containing bits of chocolate and sometimes chopped nuts." [Garfinkel Affidavit, Exhibit 10.]

b. *Other Public Usage and Understanding*

In addition to the dictionary definitions, Saccone has placed before the court a significant number of other illustrations of public usage of Toll House as a generic term. James Beard's *American Cookery* (Little, Brown & Co., 1972) contains a recipe for "Sweet Chocolate, Chocolate Chunk, Chocolate Chip, or Toll House Cookies." [Garfinkel Affidavit, Exhibit 8.] Other examples include movie reviews, restaurant reviews, television shows, etc. [Garfinkel Affidavit, Exhibits 14, 15, 16, 19.] Evidence

of this sort of widespread generic usage of a term is further persuasive support for Saccone's position.[13] *See Dan Robbins & Associates, Inc. v. Questor Corp.,* 599 F.2d 1009, 1014 (Cust. & Pat.App.1979) (listings in various publications); *Abercrombie & Fitch v. Hunting World,* 537 F.2d at 11.

2. *Nestle's Own Use of Toll House for Cookies*

Each case of this kind must be judged on its own facts and in this case it is apparent that Nestle is the victim of its own phenomenal success in selling chocolate morsels as an ingredient in homemade Toll House cookies while failing to market packaged Toll House cookies in any significant numbers.[14] In addition, documentary evidence produced by Nestle in discovery reveals a long-time practice of using the term Toll House cookie to refer to the home-baked product rather than its own manufactured product. Nestle business records, including advertising and promotional material, going back to 1941 establish that Nestle has always used Toll House as a generic term for the type of cookie used by Mrs. Wakefield in the 1930's. [Garfinkel Affidavit, Exhibits 22, 23.]

In his affidavit, Arthofer conceded that "TOLL HOUSE advertising has heavily emphasized use of TOLL HOUSE brand morsels as the principal ingredient in chocolate chip cookies. The focus of the advertising has generally been on finished cookies which are visually depicted in the advertising." [Arthofer Affidavit, ¶ 6.] All of this advertising, as indicated by the recipe for "Original Toll House Cookies" on the back of each package of morsels, refers to Toll

---

**12.** This evidence is not contradicted by the letters procured by Nestle from the editors of these dictionaries in which they agree that, in light of Nestle's Toll House trademark registrations, future editions of the dictionaries would be changed. *See Donald F. Duncan, Inc. v. Royal Tops Manufacturing Co.,* 343 F.2d 655, 665 (7th Cir.1965).

**13.** The fact that the term Toll House is capitalized in some of these instances does not preclude a finding of generic usage of the term. *See, e.g., Abercrombie & Fitch v. Hunting*

World, 537 F.2d at 11; *Donald F. Duncan v. Royal Tops,* 343 F.2d at 659 n. 2.

**14.** Nestle has not shown that any more than negligible numbers of packaged Toll House cookies were sold by it or under a license from it before the Walt Disney arrangement. [Arthofer Affidavit, Exhibit 6.] To the contrary, there are repeated examples of admissions found in the Nestle files that any sales of cookies were solely for trademark purposes. [Garfinkel Affidavit, Exhibits 25, 26, 27, 28, 30.]

House cookies, not chocolate chip cookies as the name of the product. Moreover, in his deposition Arthofer stated that a cookie made with the recipe on the back of the package and Nestle Toll House brand morsels is a Toll House cookie. [Deposition Transcript at 45, 47.][15] Given this marketing history, it is hardly surprising that Nestle's own study concluded in 1979 that to most consumers Toll House was associated with a type of product rather than a particular manufacturer's product.

### C. Nestle's Failure to Raise an Issue of Material Fact

The immateriality of the survey results relied upon by Nestle has already been covered. The other facts submitted by Nestle are equally without bearing on the question of genericness. Accordingly, none of it is sufficient to raise an issue of material fact in opposition to this motion.

As noted above, what matters in determining whether a trademark has become generic is the public understanding of the term, not that the public recognizes another generic term for the same product. For this reason, the evidence submitted by Nestle that demonstrates that manufacturers of competing products have had success without calling their products Toll House cookies is immaterial [Arthofer Affidavit, Exhibits 15, 16.] Similarly, Nestle has not cited any case law to support its novel theory that the fact that competitors have voluntarily discontinued their infringement of the Toll House mark on cookies following Nestle's objection is relevant to whether or not the term is generic. [Arthofer Affidavit, Exhibit 17.]

In addition to the survey affidavits and the Arthofer affidavit, Nestle submitted the affidavits of two food editors in an attempt to raise an issue of fact on this question. Both affiants state that they "recognize the term TOLL HOUSE as a trademark owned by The Nestle Company, Inc." Affidavits which merely state a conclusion are insufficient to oppose a motion for summary judgment. *Imperial Veal & Lamb Co., Inc. v. Caravan Refrigerated Cargo, Inc.,* 554 F.Supp. 499, 501 (S.D.N.Y. 1982). *Accord, Attorney General of the United States v. Irish Northern Aid Committee,* 668 F.2d 159, 162 (2d Cir.1982).

There is no way of knowing whether or not the affiants are referring to the Toll House trademark on cookies as opposed to chocolate morsels or whether or not their conclusions reflect public usage and understanding.[16] For the same reason, Mrs. Wakefield's recognition of the trademark status of Toll House is no evidence on whether or not the term is generic for cookies. [Arthofer Affidavit, Exhibits 13, 28.]

## V. CONCLUSION

For the reasons stated above, it is apparent that defendants have overcome the presumption of the validity of Nestle's registered Toll House trademark for cookies and, furthermore, have carried their burden on summary judgment of demonstrating that there is no genuine issue of material fact on the question of its invalidity as the common descriptive name of a product, 15 U.S.C. § 1064(c). As in *Anti-Monopoly II,* where the word Monopoly, as applied to a board game, had become generic and the registration of it as a trademark was no longer valid, 684 F.2d at 1326, so here the term

15. There is no merit to Nestle's position that other manufacturers of cooking ingredients utilize trademarks in the title of recipes used in advertising efforts without danger to the trademark name used on the ingredient. *See* Arthofer Affidavit, ¶ 17 and Exhibit 5. The other manufacturers using this technique are not attempting to hold a trademark on a manufactured product identical to the item made using the recipe. Similarly, the facts in this case are easily distinguishable from those in *Mead Johnson & Co. v. Baby's Formula Service, Inc.,* 270

F.Supp. 607 (S.D.Fla.1967), in which the items involved were two forms of the same product.

16. In *Gimix v. JS & A,* 699 F.2d 901, the party opposing summary judgment submitted an affidavit from a·distributor of the product in question which alleged that the disputed term was well known as a trademark for that product. The court rejected that affidavit as conclusory and furthermore as "not probative of a strong connection in the mind of the *consuming public* between the term and its source." *Id.* at 907.

Toll House, as applied to cookies, has become generic and the registration of it as a trademark is no longer valid. Accordingly, defendant Saccone is granted summary judgment on its first counterclaim to the extent that plaintiff's Trademark Office Registration No. 380,734 for cookies is cancelled pursuant to 15 U.S.C. § 1119.

■■■ The first and second counts of plaintiff's complaint alleging trademark infringement under 15 U.S.C. § 1114 and false designation of origin under 15 U.S.C. § 1125(a) on account of defendant's use of the term Toll House in connection with the advertising and sale of cookies are dismissed. A generic term is not capable of protection under the latter statute. *See Miller Brewing Co. v. Falstaff Brewing Corp.*, 655 F.2d 5, 7–8 (1st Cir.1981). In addition, Nestle may not extend to cookies any trademark rights that it may have on other Toll House products. The "related products" doctrine cannot be invoked to extend trademark protection to a generic term since competing manufacturers cannot be deprived "of the right to call an article by its name." *Abercrombie & Fitch v. Hunting World*, 537 F.2d at 9. To the extent that Nestle's third count under the Connecticut trademark law, Conn.Gen.Stat. § 35–11a *et seq.,* is based solely upon use by defendants of the term Toll House in connection with the sale of cookies, judgment is granted for defendants.

Although more than one claim for relief and additional claims are presented by the plaintiff in this action, and counterclaims are also presented by the defendants, I expressly determine that there is no just reason for delay in entering the judgments reached as expressed in this "Conclusion" portion of my opinion, and I direct that the judgments as set forth therein be entered forthwith.

## VI. REMAINING ISSUES

■■ Although Toll House is a generic term for cookies and defendants cannot be prohibited from using it in this connection, they must still take "reasonable care to inform the public of the source of [their] product." *Kellogg v. National Biscuit Co.,* 305 U.S. at 119, 59 S.Ct. at 114. If reasonable care is not being taken to inform the public of the source of Saccone's Toll House cookies or other products, their sale may be enjoined except under appropriate conditions. *Anti-Monopoly II,* 684 F.2d at 1326. For this reason the counts of the complaint sounding in dilution and unfair competition under Connecticut statutory and common law cannot be dismissed at this stage. Also remaining in the case are Saccone's counterclaims for cancellation of other Toll House trademarks as generic and for antitrust violations by Nestle.

SO ORDERED.