The NESTLE COMPANY, INC.

v.

CHESTER'S MARKET, INC. and
Saccone's Toll House, Inc.

Civ. No. H-82-445.

United States District Court,
D. Connecticut.

Nov. 5, 1984.

Thomas J. Ward, Michael A. Grow, and Niles V. Montan, Washington, D.C., John Murphy, Stephen E. Goldman, and Susan P. McHugh, Robinson & Cole, Hartford, Conn., Allen F. Maulsby, Cravath, Swaine & More, New York City, for plaintiff.

Richard Reynolds, Day, Berry & Howard, Hartford, Conn., Barry Garfinkel, Skadden, Arps, Slate, Meagher & Flom, New York City, Dominic J. Ferraina, Windsor, Conn., for defendants.

## RULING ON JOINT MOTION FOR ENTRY OF A FINAL JUDGMENT ON CONSENT

BLUMENFELD, District Judge.

## I. INTRODUCTION

This case comes before me in a somewhat unusual posture. On August 23, 1983, I granted partial summary judgment to defendants on their claim that the trademark Toll House owned by plaintiff is invalid, because Toll House is a generic name when used in connection with cookies. *The Nestle Co. v. Chester's Market, Inc.*, 571 F.Supp. 763 (D.Conn.1983). Pursuant to Fed.R.Civ.P. 54(b), the entry of final judgment was directed on that claim, and plaintiff thereafter filed a notice of appeal.

During pre-argument conferences before Staff Counsel for the Second Circuit, the parties reached a settlement agreement which would resolve not only the pending appeal, but also the other claims still pending before this court. These include plaintiff's state law dilution and unfair competition claims, and a variety of counterclaims by defendant Saccone. The settlement provides for a trademark license agreement, a service mark and trade name license agreement, and an options and first refusal agreement. Affidavit of Barry Garfinkel, Attorney for Defendant Saccone's Toll House, ¶¶ 5 and 6.

The settlement agreement has not, however, yet become effective. It is conditioned on this court's willingness to vacate the partial summary judgment granted against plaintiff on defendant's claim that the term "Toll House" is generic, and therefore invalid as a trademark. The parties have stated the reason for this condition in blunt fashion:

> [T]he controversy in its present posture can be resolved, and plaintiff will forego its appeal, only if plaintiff, as a condition of the settlement, can obtain the protection that it believes it needs against any subsequent use by defendants and by third parties, for collateral estoppel and other preclusive purposes, of the ruling and order of this court dated August 23, 1983, together with the findings and conclusions embodied therein, and the partial judgment of this court dated September 6, 1983, which was based upon such earlier ruling and order.

Affidavit of Barry Garfinkel, Attorney for Defendant Saccone's Toll House, ¶ 7. The Affidavit of Allen F. Maulsby, Attorney for Plaintiff, affirms the above in paragraph 3, referring to protection from preclusive effect of the 1983 judgment as "an essential condition of the settlement." [1] Therefore the parties have moved jointly for the entry of a final judgment on consent in which, inter alia, the 1983 judgment and "the find-

---

1. There is no question that if the judgment is not vacated, it would have preclusive effect despite the parties' subsequent settlement. *See* *generally* 1B *Moore's Federal Practice* ¶ 0.409[1.–1] (1984).

ings and conclusions embodied therein ... are withdrawn, vacated, and set aside." [2]

The proposed consent judgment was first brought to my attention in June of this year, when the parties came before me for a status conference which I had initiated in order to establish a schedule for resolution of the remaining issues in the case. At that point, this motion had not been filed, and, as I indicated in a Status Conference Memorandum dated June 22, 1984, I would have had no jurisdiction to consider such a motion while the appeal was pending.

The parties also asked that I consent to their application for entry of the proposed consent judgment by the Court of Appeals. I stated:

As this case is pending before the Court of Appeals, the parties need not seek or obtain my permission to report to that court that the case has been settled. If the parties find comfort in knowing my position on this question, I am not averse to their seeking, from the Court of Appeals, whatever relief they consider appropriate to effectuate the settlement of this dispute.

Status Conference Memorandum at 2.

The parties thereupon jointly moved in the Court of Appeals for entry of the consent judgment, but in August they stipulated to withdraw the motion without prejudice because, as stated in the stipulation and order approved by that court on August 15, 1984, "[the Court of Appeals] has suggested that in the first instance the entry of such a judgment on consent should be considered by the district court ...." The stipulation and order also remands the matter to this court for consideration of this motion, and preserves the parties' rights to appeal both the 1983 judgment and my decision on this motion.

2. The proposed order in its entirety reads as follows:

This cause having been brought on by the complaint of plaintiff, The Nestle Company, Inc. (hereinafter Nestle), filed on May 6, 1982, alleging in part an infringement by defendants Chester's Market, Inc. (hereinafter Chester's Market) and Saccone's Toll House, Inc. (hereinafter Saccone) of the Nestle trademark TOLL HOUSE for cookies (Reg. No. 380, 734); defendants on September 7, 1982, having answered the complaint and Saccone having counterclaimed for declaratory relief and damages; defendants on February 25, 1983, having moved for summary judgment seeking, among other relief, dismissal of the complaint and cancelation of Reg. No. 380, 734; this Court on August 23, 1983, having filed its Ruling and Order granting in part such motion for summary judgment, which Ruling and Order was embodied in a Partial Judgment entered on September 6, 1983, pursuant to Fed.R.Civ.P. 54(b); Nestle having filed with the United States Court of Appeals for the Second Circuit (Docket No. 83–7753) an appeal from such Ruling and Order and Partial Judgment; the parties having undertaken to resolve and settle their differences; the Court having further heard the attorneys for the parties with respect to Reg. No. 380, 374 covering the trademark TOLL HOUSE for cookies; the attorneys for the parties, with the approval of this Court, having agreed to the entry by the Court of a Final Judgment on Consent and having consented to the form of this Final Judgment; it is hereby

ORDERED, ADJUDGED and DECREED as follows:

1. The Partial Judgment entered by this Court on September 6, 1983, pursuant to Fed. R.Civ.P. 54(b) granting in part the motion of defendants for summary judgment and the Ruling and Order of this Court dated August 23, 1983, together with the findings and conclusions embodied therein upon which such Partial Judgment was based, are withdrawn, vacated and set aside and shall be of no force or effect for use against Nestle, its successors and assigns, by Saccone or Chester's Market or by third parties for collateral estoppel or other preclusive purposes.

2. The counterclaims asserted by Saccone in its pleading dated September 7, 1982, are dismissed with prejudice and without costs to any party as against the other.

3. Except as provided in any agreement between Nestle and Saccone, Saccone and its officers, directors, employees, agents, representatives, successors and assigns are permanently restrained and enjoined from using TOLL HOUSE as a trademark for cookies and otherwise from using TOLL HOUSE in connection with the business and operations of Saccone. Enforcement of such agreements may be sought in any court of competent jurisdiction except as limited by any such agreement.

4. Subject to any further agreements of the parties, the Order of the Court dated February 4, 1983, with respect to the protection of confidential discovery materials shall continue in effect.

5. The claims against Saccone and Chester's Market set forth in the complaint in this action are dismissed with prejudice and without costs to any party as against the other.

The appellate tribunal having placed the proverbial ball squarely in this court, a search has been made for authority concerning the standards which should be employed in deciding a motion such as this one. Regrettably, there seems to be very little authority on point, and the parties, naturally enough, have provided none. As I see it, the court is faced with two questions. First, is there some doctrine or rule which *requires* that this motion be granted, or is there discretion to grant or deny the motion? Second, if the decision is discretionary, what interests, other than the obvious interests of the movants, should be considered in exercising that discretion, and how do those interests weigh in the balance? I turn first to the question whether I have discretion at all.

## II. DISCRETION

### A. *Mootness*

■ It might be argued that, under time-honored authority concerning moot cases, the court is legally bound to grant this motion. The argument has surface plausibility. The parties have come to an agreement; there is no longer a dispute between them. It is hornbook law that in the absence of a definite and concrete controversy between parties having adverse legal interests, a court is without power to act. *E.g., Aetna Life Insurance Co. v. Haworth*, 300 U.S. 227, 57 S.Ct. 461, 81 L.Ed. 617 (1937). Where events render a case moot while an appeal from a lower court judgment is pending, the federal appellate courts will generally vacate the judgment and remand to the district court with instructions to dismiss. *United States v. Munsingwear*, 340 U.S. 36, 71 S.Ct. 104, 95 L.Ed. 36 (1950); *see* 1B *Moore's Federal Practice* ¶ 0.416[1] (1984).[3]

An analogy can be drawn to this case, even though dismissal is not precisely what the parties seek here. The argument would be that "events"—*i.e.*, the parties' negotiations—have dissolved the controversy between these parties. Only the 1983 partial summary judgment stands in the way of a comprehensive settlement, and no apparent grounds exist for disapproving that settlement. It could therefore be contended that in essence, the case is moot, and the judgment should be vacated so that the action can be dismissed on appropriate terms.[4]

■ I am not persuaded, however, that the proposed settlement renders the case moot. So long as the partial summary judgment remains in effect, there is a live controversy between these parties. *Only* if that judgment is vacated will they agree to compromise their dispute. Both parties have carefully preserved their rights to appeal and to continue to press their other claims if the judgment is not vacated. This is not a case where events outside the parties' control, such as the passage of time, *see Hall v. Beals*, 396 U.S. 45, 90 S.Ct. 200, 24 L.Ed.2d 214 (1969), have mooted the case while an appeal was pending. Instead, the parties here have attempted to moot their own dispute, but have made their settlement expressly conditional on the court's vacation of its prior judgment. The dispute therefore survives at least until this motion is decided.

■ Moreover, there are strong reasons of policy for refusing to hold the case moot

**3.** Since the appeal in this matter was withdrawn by stipulation, the Court of Appeals has expressed no opinion as to whether events have rendered this case moot while appeal was pending. However, that court has held in the past that where a case has become moot while on appeal, the appellant tribunal may *either* vacate the lower court's judgment and remand the case, *or* simply dismiss the appeal. *Wirtz v. Local Unions 410, 410A, 410B & 410C, International Union of Operating Engineers*, 366 F.2d 438, 442 (2 Cir.1966). "Upon this decision may turn the future res judicata effects of the district court's judgment." *Id.*

**4.** If an issue is "capable of repetition, yet evading review" courts will decide a case which otherwise would be considered moot. *See Southern Pacific Terminal Co. v. ICC*, 219 U.S. 498, 31 S.Ct. 279, 55 L.Ed. 310 (1911). However, this is not the type of situation where that doctrine has been applied. *Cf. Super Tire Engineering Co. v. McCorkle*, 416 U.S. 115, 94 S.Ct. 1694, 40 L.Ed.2d 1 (1974).

at this stage. If losing parties could moot cases simply by offering their adversaries financial rewards sufficient to induce cooperation in joint motions to vacate judgments, mootness doctrine would become little more than a tool with which litigants could avoid the preclusive effect of adverse decisions. Wealthy litigants could shop for favorable decisions by settling unfavorable ones after judgment. But mootness doctrine is intended to prevent courts from issuing advisory opinions, not to circumvent res judicata and collateral estoppel rules. · See *California v. San Pablo & T.R.R.*, 149 U.S. 308, 313, 13 S.Ct. 876, 878, 37 L.Ed. 747 (1893); *Wirtz v. Local Unions 410, 410A, 410B & 410C, International Union of Operating Engineers*, 366 F.2d 438, 442 (2d Cir.1966). The decision granting partial summary judgment to defendants on the claim that Toll House is a generic term was not advisory; there was a live and concrete controversy before the court when that decision was made, and that controversy will clearly remain live unless the judgment is vacated. I therefore find that this case is not moot.

### B. *Rule 60(b)*

Rule 60 of the Federal Rules of Civil Procedure governs federal courts in granting relief from judgments or orders. The rule was intended to be complete; that is, it was designed "to define the practice with respect to any existing rights or remedies to obtain relief from final judgments." *Notes of Advisory Committee on Rules*, Note to Subdivision (b) of 1946 Amendment to Rule 60.

Subdivision (b) of Rule 60 governs this motion. It permits the court to grant relief from a judgment for a variety of reasons including mistake, neglect, newly discovered evidence, and fraud, none of which is applicable here. But Rule 60(b) goes on to state:

> On motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment ... for the following reasons: ... (5) the judgment has been satisfied, re-

leased, or discharged, ... or it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment.

As an initial matter it appears that the instant motion could be considered under either subsection (5) or (6) of Rule 60(b), although subsection (5) usually applies either where there has been a financial settlement for an amount less than the amount of the judgment, or to relieve a party from an injunction which has outlived its purpose. *See* 7 *Moore's Federal Practice* ¶¶ 60.26[2] and [4], pp. 60–243 to 60–264 (1983). Even if subsection (5) is inapplicable, however, this motion can be considered under subsection (6), the residual clause of the rule. *See id.* at ¶ 60.27[1], p. 60–264.

Whether this motion falls under Rule 60(b)(5) or (6), the court must determine what test to apply or standard to follow in deciding whether the motion should be granted or denied. The rule itself prescribes practice only; it does not define substantive law. *Notes of Advisory Committee, supra.* But cases decided under the rule illumine the boundaries of the court's discretion in this area.

The very language of the rule ("the court *may* relieve") suggests that the decision whether to grant relief from a judgment is discretionary, and the cases confirm this view. *Lohman v. General American Life Insurance Co.*, 478 F.2d 719, 724 (8th Cir.), *cert. denied*, 414 U.S. 857, 94 S.Ct. 162, 38 L.Ed.2d 107 (1973); *Sampson v. RCA*, 434 F.2d 315, 317 (2d Cir.1970). *See generally* 21 *Fed.Proc., L.Ed.* § 51:116. In exercising its discretion, the court must make an appraisal of the facts in the case before it. *Lohman v. General American Life Insurance Co., supra.*

The rule should be construed so as to do "substantial justice," *Radack v. Norwegian America Line Agency, Inc.*, 318 F.2d 538 (2d Cir.1963), and subsection (6) in particular "is intended to be a means for accomplishing justice in exceptional situa-

tions." 7 *Moore's Federal Practice* ¶ 60.-27[2], p. 60–274 (1983). Clearly, the court has broad discretion when considering Rule 60(b) motions.[5]

 This discretion is not, however, entirely unfettered. Most of the cases deal with situations in which a court should *not* grant relief from judgment. For example, litigants frequently make motions under Rule 60(b) after they have failed to perfect a timely appeal. As a result, it has become established doctrine that a motion under Rule 60(b) may not substitute for an appeal. *E.g., Williams v. Sahli*, 292 F.2d 249 (6th Cir.1961), *cert. denied*, 368 U.S. 977, 82 S.Ct. 482, 7 L.Ed.2d 439 (1962); *Amoco Overseas Oil Co. v. Compagnie Nationale Algerienne de Navigation*, 459 F.Supp. 1242 (S.D.N.Y.1978), *aff'd*, 605 F.2d 648 (2d Cir.1979). "Rule 60(b) is not intended to relieve a party from the consequences of a free, calculated and deliberate choice."

*Stewart Securities Corporation v. Guaranty Trust Co.*, 71 F.R.D. 32 (W.D.Okla. 1976). *See Ackermann v. United States*, 340 U.S. 193, 71 S.Ct. 209, 95 L.Ed. 207 (1950).[6] Motions under subsections (5) and (6) of the rule will generally be granted only where "extraordinary circumstances" or "extreme hardship" exist. *United States v. Cirami*, 563 F.2d 26 (2d Cir.1977); *Mayberry v. Maroney*, 558 F.2d 1159 (3d Cir.1977); *Horace v. St. Louis Southwestern R. Co.*, 489 F.2d 632 (8th Cir.1974); *Humble Oil & Refining Co. v. American Oil Co.*, 405 F.2d 803 (8th Cir.), *cert. denied*, 395 U.S. 905, 89 S.Ct. 1745, 23 L.Ed.2d 218 (1969).

 It is apparent from the foregoing discussion that the court has substantial discretion in this matter, and that the exercise of that discretion is to be guided by considerations of substantial justice and an appraisal of the equities of the case.[7]

---

5. The breadth of discretion afforded the district courts in deciding these motions is suggested by Justice Black's statement in *Klapprott v. United States*, 335 U.S. 601, 614–15, 69 S.Ct. 384, 390, 93 L.Ed. 1099 (1949):

> In simple English, the language of the "other reason" clause, for all reasons except the five particularly specified, vests power in courts adequate to enable them to vacate judgments whenever such action is appropriate to accomplish justice.

6. Our Court of Appeals has held that the consequences of a decision to settle a case while appeal is pending cannot be avoided by a Rule 60(b) motion. *Sampson v. RCA*, 434 F.2d 315 (2d Cir.1970). Interestingly, *Sampson* was a patent case with some similarity to the trademark dispute at bar. Sampson sued RCA for patent infringement, but on RCA's motion for summary judgment the patent was held invalid. While appeal was pending, the parties settled the case. Later, Sampson moved to vacate the summary judgment in order to avoid its binding effect on him in a second case against a different defendant. The district court denied the motion, and the court of appeals affirmed.

7. Here it may be instructive to note that the scope of discretion under Rule 60(b) has been summarized as follows:

> The discretion to be exercised is a sound legal discretion guided by accepted legal principles. While such discretionary action will not be lightly interfered with by an appellate court, the latter may, however, review for abuse and will reverse when discretion is abused.

7 *Moore's Federal Practice* ¶ 60.19, pp. 60–149 to 60–154 (1983) (footnotes omitted). Judge Friendly has commented in a similar context:

> What is not so clear is precisely what [abuse of discretion] means.... When we turn to the books, we find that "abuse of discretion" has been given two rather different meanings. In one version it appears as a sort of "clearly erroneous" concept, perhaps best expressed in Judge Magruder's formulation that "when judicial action is taken in a discretionary matter, such action cannot be set aside by a reviewing court unless it has a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors." *In re Josephson*, 218 F.2d 174, 182 (1 Cir.1954). See *Pearson v. Dennison*, 353 F.2d 24, 28 & n. 6 (9 Cir.1965). Under a more limited notion discretion is held to be abused only when the action "is arbitrary, fanciful or unreasonable, which is another way of saying that discretion is abused only where no reasonable man would take the view" under discussion. See *Delno v. Market St. Ry. Co.*, 124 F.2d 965, 967 (9 Cir.1942).

*Wong Wing Hang v. Immigration and Naturalization Service*, 360 F.2d 715, 718 (2d Cir.1966).

Whatever measure of discretion may be reflected in these standards of review, it is clear that a district court acting on a motion under Rule 60(b) should weigh the interests affected by the motion and articulate carefully the reasons for its decision.

There can be no doubt that to deny the motion would work some hardship on the parties, since according to counsel's affidavits the settlement will fail unless the 1983 judgment is vacated. Thus the parties will face continued litigation despite their expressed preference for settlement.

On the other hand, it is also undeniable that Nestle made a voluntary and informed choice to commence this action and to resist defendants' motion for partial summary judgment. It was only after defendants emerged victorious that the parties decided a settlement might be preferable to continued litigation. Having chosen to litigate in the first instance, the parties in the normal course of events would be subject to the rules of issue and claim preclusion; these rules can hardly be said to work *extreme* hardship or to constitute extraordinary circumstances. *See Sampson v. RCA, supra.* *Cf. United States v. Cirami, supra.* It is to be noted in this regard that the finality of judgments should not lightly be disturbed by judicial action under Rule 60(b). *Seven Elves, Inc. v. Eskenazi,* 635 F.2d 396 (5th Cir.1981); *Sears, Sucsy & Co. v. Insurance Co. of North America,* 392 F.Supp. 398 (N.D.Ill.1974). *See Plotkin v. Pacific Tel. and Tel. Co.,* 688 F.2d 1291 (9th Cir.1982).

In any event, it is my view that in order to accomplish justice in this case it is necessary to look beyond the interests of the parties, and to take into account also the interests of the public and of the judicial system itself.[8] The motion to vacate the prior award of partial summary judgment inescapably implicates interests in the finality of judgments and in the process by which we adjudicate the validity of trademarks. To a consideration of these interests I now turn.

## III. THE INTEREST IN FINALITY OF JUDGMENTS

 Both the judicial system and the public have a strong interest in the finality of judgments. The doctrines supporting judgment finality—including res judicata and collateral estoppel—prevent needless and endless relitigation of issues and claims. As one commentator has put it:

> The doctrine of res judicata is not a technical rule, but a rule of fundamental repose for both society and litigants. Its salutary principle "is founded upon the generally recognized public policy that there must be some end to litigation and that when one appears in court to present his case, is fully heard, and the contested issue is decided against him, he may not later renew the litigation in another court." *Heiser v. Woodruff,* 327 U.S. 726, 733 [66 S.Ct. 853, 856, 90 L.Ed. 970] (1946). The doctrine prevents an encore and "reflects the refusal of law to tolerate needless litigation." *Angel v. Bullington,* 330 U.S. 183, 192–93 [67 S.Ct. 657, 662–63, 91 L.Ed. 832] (1947). And subsequent litigation is needless if, by fair process, a party over whom the court had jurisdiction raised or had an opportunity to raise issues that were a part of the cause of action previously dealt with.

1B *Moore's Federal Practice,* ¶ 0.405[1], pp. 186–87 (1984).

The interest in finality is sufficiently overriding that res judicata applies even when it leads to harsh results. "The doctrine of res judicata serves vital public interests beyond any individual judge's ad hoc determination of the equities in a particular case." *Federated Department Stores, Inc. v. Moitie,* 452 U.S. 394, 401, 101 S.Ct. 2424, 2429, 69 L.Ed.2d 103 (1981).

Like the *claim* preclusion rules embodied in res judicata doctrine, the *issue* preclusion rules embodied in collateral estoppel doctrine serve the interest in finality by preventing relitigation of issues decided in a prior proceeding. In recent years, federal courts have endorsed wide-reaching applications of this doctrine, and it is such applications which worry the plaintiff here.

---

**8.** "[P]rior to approving a consent decree a court must satisfy itself of the settlement's 'overall fairness to the beneficiaries and consistency with the public interest.'" *United States v. Trucking Employers, Inc.,* 561 F.2d 313, 317 (D.C.Cir.1977) (citation omitted).

In *Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation*, 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971), the Supreme Court endorsed the use of *defensive* collateral estoppel, which allows defendant to estop plaintiff from asserting a claim the plaintiff had previously litigated and lost against another defendant. The Court abandoned any requirement of mutuality of parties, requiring only that the estopped litigant have had a full and fair opportunity to contest the issue. The Court indicated its concern over the allocation of both judicial and private resources:

> [M]ore than crowded dockets is involved. The broader question is whether it is any longer tenable to afford a litigant more than one full and fair opportunity for judicial resolution of the same issue. The question in these terms includes as part of the calculus the effect on judicial administration, but it also encompasses the concern exemplified by Bentham's reference to the gaming table in his attack on the principle of mutuality of estoppel. In any lawsuit where a defendant, because of the mutuality principle, is forced to present a complete defense on the merits to a claim which the plaintiff has fully litigated and lost in a prior action, there is an arguable misallocation of resources. To the extent the defendant in the second suit may not win by asserting, without contradiction, that the plaintiff had fully and fairly, but unsuccessfully, litigated the same claim in the prior suit, the defendant's time and money are diverted from alternative uses—productive or otherwise—to relitigation of a decided issue. And, still assuming that the issue was resolved correctly in the first suit, there is reason to be concerned about the plaintiff's allocation of resources. Permitting repeated litigation of the same issue as long as the supply of unrelated defendants holds out reflects either the aura of the gaming table or "a lack of discipline and of disinterestedness on the part of the lower courts, hardly a worthy or wise basis for fashioning rules of procedure." *Kero-*

*test Mfg. Co. v. C–O–Two Co.*, 342 U.S. 180, 185 [72 S.Ct. 219, 222, 96 L.Ed. 200] (1952).

402 U.S. at 328–29, 91 S.Ct. at 1442–43 (footnote omitted). *See also Tillman v. National City Bank of New York*, 118 F.2d 631, 634 (2d Cir.), *cert. denied*, 314 U.S. 650, 62 S.Ct. 96, 86 L.Ed. 521 (1941) ("[E]stoppel is no mere technicality but a reasonable measure calculated to save individuals and courts from the waste and burden of relitigating old issues.")

In *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979), the Court allowed use of *offensive* collateral estoppel, which permits plaintiff to estop defendant from relitigating issues which defendant previously litigated and lost against a different plaintiff. Trial courts were given broad discretion to determine when offensive collateral estoppel should be applied, considering whether a plaintiff could easily have joined in the first action or whether application of the doctrine would in some way prejudice the defendant. *Id.* at 331, 99 S.Ct. at 651. The Court quoted *Blonder-Tongue* to establish the rationale for its decision in *Parklane Hosiery*. *Id.* at 328, 99 S.Ct. at 650.

It is evident that the reasoning which supports the very doctrines which these parties seek to avoid militates strongly against granting this motion. The decision which they seek to vacate is a final judgment, having been entered under Fed.R. Civ.P. 54(b). *See* 1B *Moore's Federal Practice* ¶ 0.401[1.–1], p. 303 (1984). If the judgment is vacated, these parties, the courts, and other parties (*e.g.*, other persons who market cookies using the name "Toll House") may, and likely will, be forced to relitigate the validity of the Toll House trademark. This question has already been litigated fully and fairly. Evidence and memoranda of law on the question of genericness were submitted by both sides and carefully considered by this court. Appeal is available if Nestle believes that this court's judgment was incorrect. There is no ground in the record of this case for any allegation that Nestle has

had less than a completely adequate opportunity to defend its position. In these circumstances, to vacate the judgment would give this litigation "the aura of the gaming table," *see Blonder-Tongue, supra,* by permitting Nestle to wager again and again on the prospect of obtaining in another court a judgment that the trademark is valid.

The interest in preventing needless relitigation is so strong that Nestle might find itself precluded from again testing the validity of the Toll House trademark even if this motion were to be granted. At least one court, applying the rationale of *Blonder-Tongue* and *Parklane,* has given collateral estoppel effect to a prior decision despite the fact that the trial court's findings of fact and conclusions of law had been withdrawn and set aside as part of a settlement agreement. *Chemetron Corp. v. Business Funds, Inc.,* 682 F.2d 1149 (5th Cir.1982), *cert. denied,* 460 U.S. 1013, 103 S.Ct. 1254, 75 L.Ed.2d 483 (1983). In *Chemetron,* the trial court had never entered a final judgment, but the appellate court determined that under the circumstances, an exception was warranted to the general rule that only final judgments could have collateral estoppel effect. The appellate court's primary concern was whether the use of collateral estoppel against the defendant in *Chemetron* was "in any way unfair." *Id.* at 1191. The court stated:

> Tactically, he chose to litigate fully [the first case], risking an adverse decision. He lost on that risk, and only when he lost did he decide to settle, fearing offensive collateral estoppel. Yet now he seeks to avoid the consequences of that loss by elevating form over substance. He cannot have it both ways.

*Id.* at 1191–92. *Cf. Kurlan v. Commissioner of Internal Revenue,* 343 F.2d 625 (2d Cir.1965) (giving collateral estoppel effect in subsequent federal litigation to a non-final decision of the California Supreme Court, despite non-mutuality of parties); *Zdanok v. Glidden Co.,* 327 F.2d 944 (2d Cir.1964) (collateral estoppel applies where an issue has been fully litigated, despite absence of final judgment). The argument for giving collateral estoppel effect to the decision at issue here would be even stronger than in *Chemetron, Kurlan,* and *Zdanok,* since the partial summary judgment in this case was final.

The foregoing considerations alone would be sufficient grounds, in my view, for refusing to grant the instant motion. The interest in finality is buttressed in this case, however, by the purposes of the trademark protection scheme itself. These purposes are discussed below.

## IV. THE INTEREST IN ADJUDICATING TRADEMARK VALIDITY

The statutory system of trademark protection was established to protect the public as well as the owner of the mark. Senate Report No. 1333, 79 Cong., 2d Sess. (1946), U.S.Code Cong.Serv. 1946, p. 1274. A trademark "makes effective competition possible in a complex, impersonal marketplace by providing a means through which the consumer can identify products which please him and reward the producer with continued patronage." *Smith v. Chanel, Inc.,* 402 F.2d 562, 566 (9th Cir.1968).

On the other hand, when a trademark has become invalid because it has become generic, its continued use as a trademark frustrates competition by discouraging other producers from using commonly accepted terminology to describe their products.[9]

**9.** The parties have informed the court that Congress has recently passed amendments to the Lanham Act, which at this writing are awaiting the President's signature. Senate Bill # 1990, the "Trademark Clarification Act of 1984," clarifies the test used to determine whether a trademark has become generic. The Senate Report accompanying the bill, S.Rep. No. 98–627, 98th Cong., 2d Sess. (1984) indicates explicitly that Congress' aim is to correct the result reached in

*Anti-Monopoly, Inc. v. General Mills Fun Group, Inc. (Anti-Monopoly II),* 684 F.2d 1316 (9th Cir. 1982), a case which was cited in this court's opinion granting summary judgment.

However, the Senate Report also states that "[t]he central inquiry remains, both before and after this legislation, whether the primary significance of the mark is to identify a product which comes from a single source—though the product be unique or the source anonymous—as

*See Anti-Monopoly, Inc. v. General Mills Fun Group,* 611 F.2d 296, 301 (9th Cir. 1979); *American Thermos Products Company v. Aladdin Industries, Inc.,* 207 F.Supp. 9, 27 (D.Conn.1962), *aff'd,* 321 F.2d 577 (2d Cir.1963). In short, just as the reason for trademark protection is to protect the public from confusion as to the source of the product, the reason for the genericness doctrine is to protect the public from anti-competitive misuse of trademarks. Thus the public interest in whether the term Toll House is generic language or a valid trademark must also be taken into account in considering this motion.[10]

Unlike a patent, a trademark does not confer a product monopoly on the holder. But the systems of patent and trademark regulation are similar in some respects, and both are designed to promote the public interest in a free competitive economy.[11] The case law concerning both patents and trademarks is replete with statements to the effect that protection of the public is a primary goal of both regulatory systems. *E.g., Mercoid Corporation v. Mid-Continent Inv. Co.,* 320 U.S. 661, 64 S.Ct. 268, 88 L.Ed. 376 (1944) (patents); *Franchised Stores of New York, Inc. v. Winter,* 394 F.2d 664 (2d Cir.1968) (trademarks). District courts have statutory authority to adjudicate the validity of both patents and trademarks. 15 U.S.C. § 1119 (1982) (trademarks); 28 U.S.C. § 1338 and 35 U.S.C. §§ 281–83 (1982) (patents).

These basic similarities between the systems of patent and trademark regulation make *Blonder-Tongue, supra,* particularly apposite to this case, for *Blonder-Tongue* involved a patent infringement claim and an adjudication that the patent was invalid.

The Court discussed in detail its reasons for precluding the holder of a patent once judged invalid from relitigating its validity in a subsequent suit. First, the Court rejected the argument that patent cases are so difficult and complex that the holder should get a second bite at the apple due to the likelihood of judicial mistake. 402 U.S. at 330–34, 91 S.Ct. at 1443–45. Then the Court discussed the economic costs to both the litigants and the judicial system of repetitive suits. 402 U.S. at 334–38, 91 S.Ct. at 1445–47.

The heart of the *Blonder-Tongue* opinion, however, is the Court's extensive discussion of the consequences of repetitive suits for accused infringers and for the economy as a whole. The Court points out that some accused infringers will find it economically impossible to defend, and will instead settle for royalty agreements which raise their production costs. The Court summed up:

> "[T]he alleged infringer who cannot afford to defend may absorb the royalty costs in order to compete with other manufacturers who have secured holdings that the patent is invalid, cutting the profitability of his business and perhaps assuring that he will never be in a financial position to challenge the patent in court. On the other hand, the manufacturer who has secured a judicial holding that the patent is invalid may be able to increase his market share substantially, and he may do so without coming close to the price levels that would prevail in a competitive market. Because he is free of royalty payments, the manufacturer with a judgment against the patent may price his products higher than competi-

opposed to identifying the product itself." S.Rep., *supra,* at 9. This is precisely the test which was applied on the summary judgment motion. *See Nestle v. Chester's Market, Inc.,* 571 F.Supp. 763, 766–67 (D.Conn.1983).

**10.** Congress considered the public's interest in trademark validity sufficiently important to include in the statute a section authorizing the federal courts to determine the validity of trademarks and to order the cancellation of registered marks held to be invalid. A court which determines the validity of a registered mark

"shall" certify its order to the Commissioner of the Patent and Trademark Office, who is bound by the decision. 15 U.S.C. § 1119 (1982).

**11.** Patent law does this by granting a *limited* monopoly to the inventor, in exchange for full disclosure, and ensuring free use of the discovery at the termination of the patent. *See Beer Nuts, Inc. v. King Nut Company,* 477 F.2d 326, 328 (6th Cir.), *cert. denied,* 414 U.S. 858, 94 S.Ct. 66, 38 L.Ed.2d 108 (1973).

tive levels absent the invalid patent, yet just below the levels set by those manufacturers who must pay royalties. Third, consumers will pay higher prices for goods covered by the invalid patent than would be true had the initial ruling of invalidity had at least the potential for broader effect.

402 U.S. at 346, 91 S.Ct. at 1452.

This reasoning is applicable to the instant case. If Nestle is permitted to escape the preclusive effect of the summary judgment decision, it will be free to threaten suit against others who may use the term Toll House. They may choose to conclude licensing agreements rather than litigate, which will raise their costs. These costs will probably be passed on to consumers. On the other hand, some defendants will litigate and win. Following the practice it has established in the instant case, Nestle might well offer these defendants settlements (in lieu of appeal) which would preserve Nestle's trademark, but would provide defendants with a competitive edge over those who chose to pay royalties without litigating. As in *Blonder-Tongue*, the result of these machinations would inevitably be prices higher than those that would prevail in a competitive market.

In sum, the public has an interest in adjudications of trademark validity which is protected by the genericness doctrine as well as by the application of collateral estoppel and res judicata rules to trademark litigation. In order to maintain a competitive market, invalid trademarks should be cancelled and the use of generic terms should be permitted in describing products. If this motion is granted, the costs of continuing market distortion will fall on future targets of infringement suits based on the Toll House trademark, and on the consuming public.

## V. CONCLUSION

In deciding whether to exercise my discretion to grant this motion under Fed.R. Civ.P. 60(b), I have balanced the interests of the parties against the interests of the public. On the one hand, the parties seek to terminate the action and to avoid the cost of further litigation. They also offer the court the not unattractive prospect of foregoing further proceedings in the case. On the other hand, the strong policies of res judicata and collateral estoppel underlying the final judgment rule substantially outweigh the interests of the parties. Moreover, the public has a strong interest in adjudicating the validity of trademarks which would be undermined by allowing plaintiff to continue to enforce the generic mark at issue in this case. I conclude that relief from the partial summary judgment decision of August 1983 is not justified under the circumstances of this case, and the motion is therefore denied.

SO ORDERED.